Kimberly **THOMPSON**, Plaintiff,

v.

Carter **CAMPBELL** and **Provident Life & Accident Insurance Company,** Defendants.

Civ. No. 4–92–477.

United States District Court, D. Minnesota, Fourth Division.

Feb. 18, 1994.

Edwin L. Sisam and Sisam & Associates, P.A., Minneapolis, MN, for plaintiff Kimberly Thompson.

Michael B. Chase and Schway & Chase, St. Paul, MN, for defendant Carter Campbell.

Marko J. Mrkonich, John M. Stoxen, Kevin M. Lindsey and Oppenheimer Wolff & Donnelly, St. Paul, MN, for defendant Provident Life & Acc. Ins. Co.

## ORDER

DOTY, District Judge.

This matter is before the court on the motion of defendants for summary judgment. Based on a review of the file, record and proceedings herein, and for the reasons stated below, defendants' motions are granted in part and denied in part.

## BACKGROUND

In 1990, Provident Life & Accident Insurance Company ("Provident") created a new department dedicated to the sale of group long-term disability ("LTD") insurance. Provident hired Kimberly Thompson ("Thompson") as the Regional Marketing Representative of a region which covered 6 states and was based in Minneapolis. Thompson was hired to sell group LTD products through brokers and independent agents. On March 4, 1992, Provident terminated Thompson. Provident contends that Thompson was fired because she violated its conflict of interest policy by engaging in other insurance business. Thompson alleges, however, that she was fired because she complained about inappropriate behavior, including allegations of sexual harassment, on the part of the Midwest Regional Director, Carter Campbell ("Campbell").

Thompson has worked in the insurance industry since 1979. She progressed from entry level positions to being a regional group sales representative. Thompson was laid off at the end of 1989 and began her own insurance agency which she operated out of her home. In the fall of 1990, Thompson was contacted by a personnel search firm about a regional marketing position with Provident. The search firm allegedly said that although the base salary was $40,000, Thompson could reasonably expect to earn between $65,000 and $70,000 her first year. Thompson expressed interest in the position and the search firm arranged for her to interview with Campbell.

Campbell went to Minnesota to interview Thompson. According to Thompson, Campbell represented that: (1) she could reasonably expect to make between $65,000 and $70,000 her first year with Provident; (2) Provident would hire an assistant for Thompson's office within 6 months; (3) no additional marketing representatives would be hired in Thompson's territory for at least 2 years; (4) Thompson was hired as a manager to develop a six state territory and would receive an override on any additional representative's business; (5) Thompson would not have to turn over her brokers list to Provident without compensation; (6) Thompson could maintain and service her existing accounts; and (7) Thompson would have permanent employment with Provident if she successfully completed the initial 90 day probation period.

After the interview, the search firm called Thompson and extended an offer of employment on behalf of Provident. The search firm also sent Thompson a written offer indicating that her base salary would be $40,000 plus commissions, benefits and a company car. Thompson wrote a letter to Campbell to clarify the agreement concerning her existing accounts. Thompson stated that she had a number of group clients and a few individual clients that she wanted to keep under her agency. Thompson avowed that she only intended to "renew and service" her existing clients and would not be adding any new clients. Thompson indicated that she would work with various carriers when she renewed business. Thompson noted that because she would only be selling group LTD with Provident, servicing her existing clients should not create a conflict of interest.[1] Campbell responded that Thompson could continue to service her existing accounts but could not sell group LTD through her agency.

Other than the correspondence concerning Thompson's existing accounts, there were no writings confirming the employment terms. Thompson decided to accept Provident's offer of employment. On November 2, 1990, Thompson completed and signed a job application form provided by Provident. Thompson indicated on the form that her expected salary was negotiable. The application stated that:

> Provident makes no representation that employment with the Company is for any specified term of years. While Provident's past record can be illustrated by a longstanding tradition of job security and loyalty to satisfactory employees, Provident re-

---

**1.** Thompson offered to provide a list of her clients but apparently Campbell did not request one. Thompson now claims that she had seven existing accounts, including her husband and herself, at the time she joined Provident. Other clients identified by Thompson include Lemma Corporation, Mutual Green, Sims Security, HealthCare Recruiting of Minnesota, Wedemeyer & Assoc.

serves the right to terminate employees for the Company's best interest, for unsatisfactory job performance, for unsatisfactory attendance, for violation of Company rules and policies, because an individual's services become excess to the Company's staffing needs, or at the sole discretion of Provident.

Despite the broad language about Provident's right to terminate employees, Thompson stated at her deposition that she understood this provision to mean that Provident could not fire her without good cause.

Provident immediately sent Thompson to Chattanooga, Tennessee for a training seminar. After Thompson returned from the seminar, she signed Provident's conflict of interest form and sent it to Campbell in the Chicago office. The conflict of interest form provided, in relevant part, that:

\* \* \* \* \* \*

2. No employee shall become connected directly or indirectly, with any competing company or industry during the term of his employment except with the written consent of Provident.... Provident solely shall make the determination as to whether there is interference or a competing company.

3. Every employee is required to disclose any outside employment activities or interests ... that conflict or suggest a potential conflict with the business interests of Provident.

\* \* \* \* \* \*

Violation of these rules could lead to disciplinary action including involuntary termination.

I have read the Company's policy statement which is printed above and agree to comply therewith. To the best of my knowledge and belief, I am not involved in any activity and have no outside interests that conflict or suggest a conflict with the business interests of Provident[.]

If at any time in the future there is ever any doubt as to whether a particular activity or transaction is consistent with Provi-

dent's policy, I will refer it to Provident for consideration.

The form also instructed the employee to disclose any outside business or interests that might create a conflict of interest. Thompson left that portion of the form blank and did not indicate any outside business or interests or her agreement with Campbell.

In January 1991, Thompson asked Campbell if she could be a writing agent for Provident individual disability insurance policies. Campbell told Thompson to address the issue with Ted Willard ("Willard"), the Vice President of LTD Sales and Campbell's immediate superior. Thompson wrote to Willard, indicating that occasionally she would have the opportunity to replace individual policies with business clients of her former agency. She inquired whether she could be a writing agent for individual policies with Provident. On February 11, 1991, Willard responded that Thompson could not write individual policies for Provident. Thompson did not ask Willard whether she could write individual policies with other carriers because she believed that her agreement with Campbell already authorized her to do so.[2]

In early 1991, LTD marketing representatives from Chicago began complaining among themselves about Campbell's conduct. Apparently Campbell managed through arbitrary threats, belittling remarks and intimidation. Campbell also complimented female representatives on their appearance and commented to others on their anatomy and clothing. The representatives seemed to fear Campbell and had little respect for him as a manager. The complaints were communicated to Thompson and, soon thereafter, she began experiencing problems with Campbell.

Thompson considered Campbell a poor manager with little knowledge of LTD insurance. According to Thompson, he dressed inappropriately for business meetings, was unprofessional, brought his family on a business trip and tried to bring his son on a call to a broker. Campbell allegedly gossiped about other employees and commented on their attire, including what clothing accentu-

---

2. Willard apparently received a copy of Campbell's memorandum dated October 29, 1990, confirming that Thompson could service her existing accounts.

ated the breasts and buttocks of various female representatives. On several occasions, Campbell placed, or at least attempted to place, his arm around Thompson's shoulders. Thompson also claims that Campbell behaved improperly at several meetings with brokers. On one call, he rubbed a female broker's leg with his foot; on others, he told Thompson to alter quotes without approval from the underwriter. Thompson also contends that Campbell failed to safeguard and often disclosed confidential information about employees including herself.

In the fall of 1991, Thompson and other midwest marketing representatives decided to voice their concerns about Campbell to Mitch Pietruszka ("Pietruszka"), the Vice President of Marketing for the LTD division. Helen Van Pelt ("Van Pelt"), a marketing representative from Denver, met with Pietruszka on October 30, 1991, to express her concerns about Campbell. Van Pelt indicated that her concerns were commonly held and suggested that Pietruszka meet with other marketing representatives in the midwest region. The next day, Pietruszka met with Thompson to hear her complaints about Campbell.[3] On November 6, 1991, Pietruszka met individually with each of the marketing representatives in the Chicago office.

Pietruszka concluded that the representatives raised serious issues about Campbell's unprofessional conduct and management style. Pietruszka met with Campbell on November 6, 1991. Without betraying any confidentialities, Pietruszka relayed the substance of the complaints. Campbell admitted that on occasion he had forged signatures, changed rates without prior approval and shared confidential information. Campbell denied any unprofessional conduct on his part and felt that overall he was doing a good job. Pietruszka was bothered by Campbell's casual attitude and lack of concern for his conduct and poor performance. Upon Pietruszka's recommendation, Provident placed Campbell on probation for 90 days effective immediately. Campbell was warned that he would be fired if his actions were "less than

professional or ethical, or [could] in any way be construed to be retaliatory towards any of [his] direct reports."

Over the course of her employment, Provident apparently had heard rumors that Thompson was selling business for other insurance carriers. In late 1991, Provident told Campbell to confront Thompson about the rumors. Thompson claims she told Campbell that she was renewing and servicing business for clients through her agency pursuant to their earlier agreement. Campbell apparently told Provident that Thompson maintained she was not engaged in insurance business outside of her LTD work for Provident. Campbell said nothing to Provident about the agreement concerning Thompson's existing clients. Rumors of Thompson's other insurance activities persisted. Provident told Campbell to procure a list of carriers with which Thompson was appointed from the State of Minnesota. Campbell obtained the list in early February 1992 and turned it over to Provident without any mention of the earlier agreement. At the time, Campbell's job was in jeopardy and he had told Provident that he blamed Thompson for his predicament.

On February 3, 1992, Provident, through Campbell, hired Scott Froehlich to work as another representative out of the Minneapolis office. Campbell allegedly told Froehlich that he was going to get rid of Thompson. Froehlich reported to Thompson that Campbell had threatened her job. Thompson immediately contacted Pietruszka and told him that Campbell was threatening her. Pietruszka replied that Thompson should not worry because Provident planned to terminate Campbell. The next day, Provident fired Campbell for failing to show significant improvement.

The list of appointments obtained from the Minnesota Commissioner's Office revealed that Thompson had been appointed to represent other carriers, including Paul Revere Life Insurance Company, while she was em-

---

**3.** Thompson alleges in the complaint and in her affidavit that she organized all of the midwest marketing representatives to bring their complaints to Pietruszka's attention. Thompson testified at her deposition, however, that she did not play a leadership role and that Helen Van Pelt was the first to complain to Pietruszka about Campbell.

ployed by Provident. Provident decided to terminate Thompson for violating its conflict of interest policy by engaging in outside insurance business. On March 4, 1992, Jim Bianco ("Bianco") went to Minnesota at Pietruszka's behest and told Thompson that she was terminated for violating the conflict of interest policy.

Thompson protested her discharge, claiming that her agreement with Campbell authorized her actions. Sahira Sorrels ("Sorrels"), the Human Resources Manager for Provident, was notified about the agreement. Copies of Thompson's letter of October 23, 1990, and Campbell's response dated October 29, 1990, were faxed to Provident's headquarters. The letters were briefly reviewed by Provident's legal department. Without further inquiry of Thompson or Campbell, Provident decided that the letters did not authorize Thompson to become appointed with other carriers and place policies with them during the course of her employment. A conference call was held between Bianco, Sorrels and Pietruszka. Pietruszka told Bianco to terminate Thompson notwithstanding the letters concerning her existing clients.[4]

Thompson brought suit in federal court based on diversity. Thompson charged Provident with illegal retaliation, common law wrongful discharge, negligent retention, breach of contract and promissory estoppel. Thompson also asserted claims of sexual harassment, defamation and fraud against Provident and Campbell. Defendants have moved for summary judgment on all of Thompson's claims.

## DISCUSSION

The court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P.

56(c). This standard mirrors the standard for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), which requires the trial court to enter judgment as a matter of law if there can be but one reasonable conclusion as to the verdict. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* at 249, 106 S.Ct. at 2511.

On a motion for summary judgment, the court views the evidence in favor of the nonmoving party and gives that party the benefit of all justifiable inferences that can be drawn in its favor. *Id.* at 250. The nonmoving party, however, cannot rest upon mere denials or allegations in the pleadings. Nor may the nonmoving party simply argue facts supporting its claim will be developed later or at trial. Rather the nonmoving party must set forth specific facts, by affidavit or otherwise, sufficient to raise a genuine issue of fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If reasonable minds could differ as to the import of the evidence, judgment as a matter of law should not be granted. *See Anderson*, 477 U.S. at 250–51, 106 S.Ct. at 2511. If a plaintiff fails to support an essential element of a claim, however, summary judgment must issue because a complete failure of proof regarding an essential element renders all other facts immaterial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

### 1. Sexual Harassment Hostile Environment Claim

Thompson alleges that defendants discriminated against her on the basis of her sex in violation of the Minnesota Human Rights Act, Minn.Stat. § 363.03, subd. 1(2) ("MHRA").[5] Thompson claims that Campbell's conduct created a "hostile work environment." A hostile work environment ex-

---

4. Thompson claims that she overheard Pietruszka ask Bianco if the agreement was attached to the conflict of interest form signed by Thompson. When Bianco replied that it was separate, Pietruszka allegedly told him "to fire the bitch anyway."

5. Liability for employment discrimination under the MHRA is interpreted with reference to the standard established by the federal courts in applying Title VII. *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 442 (Minn.1983).

ists when sexual conduct has the purpose or effect of substantially interfering with an individual's employment or creating an intimidating, hostile or offensive work environment. Minn.Stat. § 363.01. The MHRA is violated when the workplace is permeated with sexual conduct that is sufficiently severe or pervasive to create a discriminatory hostile or abusive work environment.

Thompson claims that Campbell often discussed the anatomy of other women. Specifically, Campbell allegedly commented on the size and appearance of the breasts and buttocks of women in the Chicago office. He also opined on whether their clothing displayed those attributes to his liking. Thompson claims that Campbell once said he was attracted to his cousin in Chicago and had sexual fantasies about her. On several occasions, Campbell placed, or at least attempted to place, his arm around Thompson's shoulders during business conversations. No sexual remarks or innuendo accompanied these incidents. Thompson also alleges that on a call with a female broker, Campbell began rubbing the broker's leg with his foot.[6]

■ To prevail on her hostile environment claim, Thompson must show that (1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take proper remedial action. *Bersie v. Zycad Corp.*, 417 N.W.2d 288 (Minn.Ct.App.1987). Thompson is a member of a protected class and there is evidence from which a jury could find that the alleged harassment was based on sex. Provident and Campbell claim, however, that Thompson has failed to establish the second, fourth and fifth element of her prima facie case.

■ The gravamen of any sexual harassment claim is that the alleged sexual conduct was unwelcome. *Kresko v. Rulli*, 432 N.W.2d 764, 768 (Minn.Ct.App.1988) (citing *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).

The threshold for determining that the conduct is unwelcome is whether it was uninvited and offensive. *Id.* Defendants contend that Thompson cannot show that the alleged conduct was unwelcome because she did not protest contemporaneously to Campbell.

Thompson did not immediately complain to Campbell's superiors; nor did she confront Campbell and tell him to stop harassing her. Thompson did, however, register contemporaneous complaints with her peers in the Chicago office. In response to Campbell's crude comments, Thompson told him she did not want to talk about such matters and changed the subject. When Campbell put or tried to put his arm around Thompson, she excused herself and deliberately moved away from him. Although Thompson did not directly ask Campbell not to touch her, she contends that her discomfort in these situations was obvious to Campbell. It is undisputed that Thompson neither invited nor encouraged Campbell's conduct. Accordingly, the court finds that Thompson has raised a genuine issue of material fact concerning whether Campbell's conduct was unwelcome.

■ To establish the fourth element of her prima facie case, Thompson must show that the harassment was "sufficiently severe or pervasive as to alter the conditions of her employment and create an abusive working condition." *Klink v. Ramsey County*, 397 N.W.2d 894, 901 (Minn.Ct.App.1986) (quoting *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405). Vulgar behavior in the workplace does not automatically trigger an actionable claim of a hostile work environment by an employee who finds such conduct offensive. *Id.* Rather, the evidence must show that a reasonable person would consider the offensive conduct sufficiently pervasive to create an abusive work environment.

■ Whether sexual conduct is sufficiently severe or pervasive to create a hostile work environment is determined from the totality of the circumstances. *Jenson v. Eveleth Taconite Co.*, 824 F.Supp. 847, 874 (D.Minn.1993) (citation omitted). The court considers "the frequency of the discriminatory conduct; its

---

**6.** No quid pro quo harassment is present here. Campbell did not ask Thompson on a date, did not proposition her or make any sexual overtures.

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.,* —— U.S. ——, ——, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993).

Thompson's contact with Campbell was sporadic as he was officed in Chicago and was not in Minneapolis on a routine basis. When Campbell was present in Minnesota, there is evidence that indicates the offensive conduct occurred with some frequency. Taking the conduct at its worst, Campbell often made crass comments to Thompson about other women who worked for Provident. Campbell also placed or tried to place his arm around Thompson's shoulder during business conversations on a regular basis. Thompson made subtle attempts to deter such behavior but did not directly ask Campbell to stop the offensive conduct. The severity of Campbell's offensive conduct was minor. None of the alleged sexual remarks were directed at Thompson. Campbell's conduct did not physically threaten or personally humiliate Thompson. Nor is there evidence that the alleged harassment substantially interfered with Thompson's employment.

The court does not condone Campbell's coarse behavior. The court concludes, however, that Thompson has not carried her burden on the issue of pervasiveness. Thompson has failed to raise a question of material fact as to whether a reasonable person would consider the offensive conduct sufficiently pervasive to create an abusive work environment. Campbell's conduct as it related to Thompson was of an insufficient nature and quantity to constitute a hostile work environment as a matter of law. The court concludes that Thompson's workplace was not permeated with discriminatory be-

havior that was sufficiently severe or pervasive to create an hostile or abusive working environment. Defendants are entitled to summary judgment as Thompson has failed to prove a prima facie case of a hostile work environment.[7]

### 2. Retaliatory Discharge

■ Thompson claims that Provident discharged her in retaliation for opposing Campbell's conduct. Thompson's retaliatory discharge claim is premised on Minnesota's whistleblower statute. Minn.Stat. § 181.932. Under Minnesota law, an employee is wrongfully discharged when she is fired for reasons which are against public policy, such as reporting a violation of law. *Phipps v. Clark Oil & Refining Corp.,* 408 N.W.2d 569, 571 (Minn.1987). Minn.Stat. § 181.932 prohibits an employer from discharging an employee who "in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official." *Id.*[8]

■ The familiar three-part procedure of shifting burdens also applies to claims of retaliation under Minn.Stat. § 181.-932. *See, e.g., Parten v. Consolidated Freightways Corp.,* 923 F.2d 580, 584 (8th Cir.1991); *Phipps v. Clark Oil & Refining Corp.,* 408 N.W.2d 569, 572 (Minn.1987). To state a prima facie case of retaliation, Thompson must establish: (1) she engaged in conduct protected under the act; (2) adverse employment action by the employer; and (3) a causal connection between the two. *Hubbard v. United Press Int'l., Inc.,* 330 N.W.2d 428, 444 (Minn.1983).

---

7. The court need not decide whether Thompson established the final factor of her prima facie case, namely knowledge and lack of remedial action on the part of the employer. The court notes that Campbell was a supervisory employee who not only knew of the alleged harassment, but was its perpetrator. Campbell's knowledge of the alleged harassment is imputed to Provident. *McNabb v. Cub Foods,* 352 N.W.2d 378 (Minn.1984). The court also notes that Provident took swift remedial action once it had actual knowledge of the alleged harassment.

8. The court notes that Thompson's retaliatory discharge claim is not tied to the success of her sexual harassment claim. It is not necessary for Thompson to establish that Campbell's conduct was in fact discriminatory or that she was the victim of sexual harassment in order to prevail on her whistleblower claim. Rather, it is enough that Thompson had a good faith, reasonable belief that the conduct she challenged violated federal or state law. *Accord Wentz v. Maryland Cas. Co.,* 869 F.2d 1153 (8th Cir.1989).

■■■ Thompson's complaints about Campbell's alleged sexual harassment concern a clearly mandated public policy and, therefore, constitute conduct protected by the Whistleblower Act.[9] Her termination is obviously an adverse employment action. The critical question before the court is whether Thompson can show a causal connection between the two events. The requisite causal connection may be shown circumstantially by proof that Provident knew of the protected activity and Thompson's discharge followed closely in time. *Hubbard*, 330 N.W.2d at 445.

Provident argues that Thompson has failed to show that it knew of the protected activity before her discharge. Provident contends that Thompson never made any allegations of sexual harassment until she filed the complaint in this action. Pietruszka admitted, however, that Thompson accused Campbell of making sexual comments in October 1991. Provident also claims that Thompson cannot show a causal connection because she was terminated 4 months after her meeting with Pietruszka. The time between Thompson's meeting with Pietruszka and her termination does not vitiate causation as a matter of law. *See Tretter v. Liquipak Intern., Inc.*, 356 N.W.2d 713, 715 (Minn.Ct.App.1984) (retaliation under the MHRA where employee was demoted 3 months after complaining about her manager and was terminated 6 months later). The court concludes, however, that an inference of retaliatory motive is not justified by virtue of the timing of Thompson's discharge alone.

Aside from showing that her discharge occurred four months after she complained about Campbell's conduct, Thompson offered evidence that Campbell told others she was a complainer and that he was going to have her fired. The evidence also indicates that Provident told Campbell to investigate Thompson's other insurance activities even though it knew he blamed her for placing his job in jeopardy.[10] The court finds that the circumstantial evidence raises a question of material fact concerning the causal connection between Thompson's protected conduct and her termination.

Provident contends that, even if Thompson established a prima facie case of retaliation, it has demonstrated that she was fired for a legitimate reason, namely her activity with competing insurance companies. Thompson, relying on the written agreement between her and Campbell, argues that Provident's reason for her termination is merely a cover-up for retaliation because it has no basis in fact. There is evidence from which a jury could conclude that Provident had a legitimate reason for terminating Thompson. A reasonable jury could also reach a contrary conclusion based on the present record. Accordingly, the court holds that Thompson's claim that Provident violated the Whistleblower Act withstands summary judgment.

Thompson also asserts a claim under the anti-reprisal provisions of the MHRA. Minn. Stat. § 363.03, subd. 7. The familiar three-part procedure of shifting burdens also applies to claims of retaliation under Minn.Stat. § 363.03. *Hubbard*, 330 N.W.2d at 444. The discussion above concerning Thompson's claim under the Whistleblower Act applies with equal force to her MHRA claim. Accordingly, the court denies defendants' motion for summary judgment on Thompson's claim of reprisal in violation of the MHRA.

### 3. Common Law Wrongful Discharge Claim

■■■ Thompson asserts that she was wrongfully discharged in violation of common

9. Thompson alleges that her allegations that Campbell disclosed confidential information and gave unverified quotes also fall within the protection of the Whistleblower Act. The court disagrees. The Act covers only reports of the kind of wrongdoing that breaches clearly mandated public policy. *Vonch v. Carlson Companies, Inc.*, 439 N.W.2d 406 (Minn.Ct.App.1989). The court holds that the other complaints voiced by Thompson centered around internal management problems and did not implicate clearly mandated public policy.

10. The evidence indicates that Thompson was fired based on information gathered by Campbell and that he intentionally failed to divulge the agreement concerning Thompson's existing clients. Despite Provident's contentions to the contrary, Thompson need not prove that Campbell played a role in the ultimate decision to terminate her to establish a prima facie case of retaliation.

law. Like her statutory claim, Thompson's common law claim is based on her complaints about alleged sexual harassment and disclosure of confidential information. The court rejects the common law claim. Minnesota courts have not recognized a common law action for discharge based on reported violations of the law that exists independently of Minnesota Statute § 181.932. *Piekarski v. Home Owners Sav. Bank, F.S.B.*, 956 F.2d 1484, 1493 (8th Cir.1992) (citations omitted); *see Steinback v. Northwestern Nat'l Life Ins. Co.*, 728 F.Supp. 1389, 1394 (D.Minn.1989) (holding that Minnesota does not recognize a general common law claim for wrongful discharge and rejecting plaintiff's claim because it duplicated a statutory claim). The court holds that Thompson has no common law claim for discharge in violation of public policy.[11]

### 4. Negligent Retention

■ Thompson claims that Provident breached the duty it owed her under the theory of negligent retention. Under Minnesota law, an employer has a duty to refrain from retaining employees with known dangerous proclivities. *Kresko v. Rulli*, 432 N.W.2d 764, 769 (Minn.Ct.App.1988). Negligent retention addresses risks created by exposing third parties to a potentially dangerous individual. *Yunker v. Honeywell, Inc.*, 496 N.W.2d 419, 422 (Minn.Ct.App. 1993). The theory holds the employer directly liable for an employee's intentional tort when the employer knew or should have known that the employee might engage in injurious conduct. *Id.* Negligent retention focuses on when the employer had notice that an employee posed a threat of injury and failed to take steps to insure the safety of third parties. *Id.* at 423.[12]

■ Provident argues that tort claims based on negligent retention arise only where the employer has reason to know that an employee poses an unreasonable risk of serious physical injury to a third person. Provident insists that Thompson cannot state a claim for negligent retention because she alleges only sexual harassment as opposed to physical injury. The existence of a legal duty is an issue for the court to decide. *Larson v. Larson*, 373 N.W.2d 287, 289 (Minn.1985). The court notes that the Minnesota courts have not clearly defined the parameters of the duty or the type of claims arising out of the negligent retention of an employee. Minnesota courts have recognized, however, that a claim for negligent retention may lie where an employee subjects another employee to sexual harassment. *Kresko*, 432 N.W.2d at 769–70. The court holds that Thompson states a cognizable claim of negligent retention to the extent that her claim is based on Campbell's alleged sexual harassment.[13]

■ To hold Provident directly liable in tort, however, Thompson must show that Provident was negligent. There is no evidence to show that Provident knew or should have known of Campbell's behavior and failed to take timely action. Rather, the evidence indicates that, once aware of Campbell's alleged inappropriate behavior, Provident took timely corrective measures. Provident promptly investigated Campbell, put him on probation and monitored his conduct. The fact that Provident had additional reasons for placing Campbell on probation does not undermine the propriety of its response.

Thompson argues that Provident's response was insufficient because close, daily

11. The court also notes that to the extent Thompson seeks redress for conduct redressed by the MHRA, her common law claim is precluded by that statute. Minnesota law precludes common law claims for adverse employment actions covered by the MHRA. Minn.Stat. § 363.11; *Wirig v. Kinney Shoe Corp.*, 461 N.W.2d 374, 378–79 (Minn.1990).

12. Minnesota case law treats negligent hiring and negligent retention as related but distinct theories of recovery. *Yunker*, 496 N.W.2d at 423. Negligent hiring occurs when, prior to the

time the employee is actually hired, the employer knew or should have known of the employee's unfitness. *Id.* Negligent hiring is not at issue here.

13. The court agrees with Provident that Thompson fails to state a claim for negligent retention insofar as she relies on Provident's alleged knowledge of Campbell's "propensity to fraud, misrepresentation, divulging confidential information ... defamation and threats of retaliation."

supervision of Campbell was not feasible. At the time Campbell was placed on probation, Provident had no reason to believe that its response was inadequate to correct Campbell's behavior. Moreover, Thompson concedes that, except for one isolated incident, no further incidents of harassment occurred after disciplinary action was taken against Campbell. Thompson has failed to present sufficient facts to raise an issue of material fact that Provident breached the duty it owed Thompson arising out of the continued employment of Campbell. Accordingly, the court grants Provident's motion for summary judgment on Thompson's claim for negligent retention.

## 5. Breach of Contract

■■■ Thompson insists that material issues of fact exist regarding her breach of contract claim. Absent a contrary agreement by the parties, employment relationships in Minnesota are generally presumed to be at-will. *See Pine River State Bank v. Mettille,* 333 N.W.2d 622, 627 (Minn.1983). This means the employer may summarily dismiss the employee at any time for any reason or no reason at all. *Id.* To overcome the presumption of at-will employment, Thompson must present evidence that defendants made "oral or written statements with specific and definite provisions, and not general statements of policy." *Lindgren v. Harmon Glass Co.,* 489 N.W.2d 804, 810 (Minn. Ct.App.1992). *See Pine River,* 333 N.W.2d at 626 ("The offer must be definite in form and must be communicated to the offeree.... An employer's general statements of policy are no more than that" and do not suffice).

■■■ There was no formal written employment contract between Thompson and Provident. Rather, Thompson alleges an oral contract for permanent employment until retirement. General statements regarding job permanence and job security are not definite offers and do not modify the at-will relationship. *Aberman v. Malden Mills Indus., Inc.,* 414 N.W.2d 769, 771–72 (Minn.Ct. App.1987). The following terms indicate only an at-will contract: "permanent employment," "life employment" and "as long as the employee chooses." *Id.* (citations omitted). Minnesota courts are reluctant to find a lifetime employment contract because such alleged contracts are often "oral, uncorroborated, vague in important details and highly improbable." *Id.* (quotation omitted). To establish a contract for permanent employment, Thompson must show that Provident clearly intended to create such a contract. *Corum v. Farm Credit Servs.,* 628 F.Supp. 707, 713–14 (D.Minn.1986).

Thompson contends that Provident, through Campbell, extended her a definite offer of permanent employment until she retired. According to Thompson, the search firm told her that Provident was a carrier she could trust and that Provident intended the position in Minneapolis to be a permanent situation, not a temporary office. Thompson explained that she was not willing to abandon her own agency for a position of uncertain duration. The search firm assured her that Provident was looking for a permanent person and convinced her to interview with Campbell. Thompson claims that Campbell confirmed she would have permanent employment with Provident after an initial probationary period. Thompson argues that these statements concerning permanent employment modified the at-will nature of the employment relationship.

Although the existence of a contract is a question of fact, the resolution of whether language rises to the level of a contract is for the court. The evidence, taken in Thompson's favor, does not show that Provident clearly intended to create a permanent employment contract. Campbell and the search firm made vague statements and assurances to Thompson about the permanency of her position. Those statements are not sufficiently specific and definite to constitute a valid offer of a permanent employment contract. Moreover, the application form signed by Thompson demonstrates that Provident intended an at-will relationship. The form stated that "Provident makes no representation that employment with [it] is for any specified term of years." The form also stated that, although Provident has a good track record of job security, it reserved the right to terminate employees at its discretion. De-

spite the broad language about Provident's right to terminate employees, Thompson believed the provision meant that Provident could not fire her without good cause. Thompson's subjective impressions and beliefs, however, are not relevant to ascertaining contractual terms. *Pine River*, 333 N.W.2d at 626.

■ Absent a clear intent to form a contract of permanent employment, Thompson may prevail on her contractual claim by showing that she gave some consideration beyond that which is normally involved in the employment relationship itself. *Pine River*, 333 N.W.2d at 627. Thompson argues that even if she cannot meet the definiteness requirement, she supplied the requisite additional consideration by leaving her insurance agency and by bringing a brokerage list with her to Provident. The court disagrees.

Thompson decided to forego the opportunity to pursue her insurance agency when she joined Provident. She preserved the right, however, to "renew and service" the clients she had to date. Under Minnesota law, foregoing other work opportunities, whether they consist of job offers or self-employment, does not constitute additional consideration. *See, e.g., Corum,* 628 F.Supp. at 713; *Aberman,* 414 N.W.2d at 772 (both citing *Montgomery v. American Hoist & Derrick Co.,* 350 N.W.2d 405, 408 (Minn.Ct.App.1984)). The fact that Thompson brought her brokerage list to Provident is not consideration uncharacteristic of the employment relationship. *See Aberman,* 414 N.W.2d at 772 ("employee must show some unusual consideration so the court has better reason to believe this was no ordinary at-will contract.") (citation omitted). Consequently, the brokerage list does not indicate that the parties contemplated anything more than an at-will relationship.[14]

Thompson also alleges that Provident breached her employment contract "in the manner in which it terminated [her]." Thompson concedes that she could be fired for any reason at all during her initial 90 day probationary period. After that, Thompson claims she had an oral agreement with Provident that she could only be terminated for good cause and after a probationary period. There is absolutely no evidence, however, that Provident made Thompson an offer of "for cause" employment. Thompson tries to modify her at-will status by relying on evidence that Provident's general policy was to not discharge employees without placing them on probation. Thompson has not offered any evidence that Provident ever told her she could be fired only for good cause and after a probationary period.

Provident's manager's guide indicates that Provident has a general policy to discharge employees only after a certain procedure is applied. There is no evidence that the manager's guide was disseminated to Thompson. Minnesota courts have held that, even though an employer has a policy of following a certain termination procedure, and even though the employee has knowledge of that policy, there is no employment contract unless the employer communicated that to the employee. *Pine River,* 333 N.W.2d at 626; *accord Piekarski v. Home Owners Sav. Bank, F.S.B.,* 956 F.2d 1484, 1490 (8th Cir.1992) (citations omitted). Moreover, the manager's guide makes clear that Provident retains the discretion to discharge employees without any warning or probationary period.[15]

■ There is one aspect of Thompson's breach of contract claim that survives summary judgment. The evidence indicates that Provident agreed not to terminate Thompson for engaging in certain insurance business on behalf of her existing clients. When Thompson joined Provident, she had written authorization to "renew and service" her existing clients. The court finds that the agreement regarding Thompson's existing business is

---

**14.** Thompson places great reliance on two Minnesota cases which involved modification of at-will employment relationships, *Eklund v. Vincent Brass and Aluminum Co.,* 351 N.W.2d 371 (Minn.Ct.App.1984) and *Rognlien v. Carter,* 443 N.W.2d 217 (Minn.Ct.App.1989). The court concludes that the nature of the employer's statements and promises as well as the employee's reliance in those cases differ significantly from the facts and circumstances of this case.

**15.** The court also notes that Thompson's successful completion of the probationary period is insufficient under Minnesota law to modify her at-will status. *Piekarski,* 956 F.2d at 1490.

sufficiently definite to raise an issue of fact on the modification of her at-will status.

Provident insists that, even if a contract existed, Thompson has not shown it was breached because she was fired for violating the conflict of interest policy by acting outside of the agreement. The written agreement does not, however, define the parameters of "renew and service". Thompson contends that the phrase would customarily include appointments with new carriers. Based on that interpretation, Thompson insists that she did not operate outside of the agreement. Provident argues that the agreement merely authorized Thompson to place existing business with carriers she was licensed with and appointed by prior to joining Provident. Provident claims that any new appointments would have to be approved separately. The court concludes that Thompson raises an issue of material fact as to whether Provident breached the agreement by terminating her for engaging in other insurance business.

## 6. Promissory Estoppel

■ To state a cause of action based on the doctrine of promissory estoppel, Thompson must show: (1) Provident made a promise; (2) Provident expected or should have reasonably expected the promise to induce substantial and definite action by Thompson; (3) the promise did induce such action; and (4) the promise must be enforced to avoid injustice. *Grouse v. Group Health Plan, Inc.,* 306 N.W.2d 114 (Minn.1981); *Corum v. Farm Credit Servs.,* 628 F.Supp. 707, 715 (D.Minn.1986). The effect of this doctrine is to imply a contract from a unilateral or otherwise unenforceable promise when accompanied by detrimental reliance. *Del Hayes & Sons, Inc. v. Mitchell,* 304 Minn. 275, 230 N.W.2d 588, 593 (1975).

■ To be enforceable, "the promise must be clear and definite." *Cohen v. Cowles Media Co.,* 479 N.W.2d 387, 391 (Minn.1992). Thompson claims that she relied to her detriment on Campbell's oral representations concerning permanent employment by quitting her insurance agency. She also argues that she relied on Provident's promise that she would not be terminated without first being

placed on probation. The court has already held that the alleged promise of permanent employment was general and vague. The evidence does not support Thompson's claim that Provident made any promises about a pretermination probationary period.

■ The court finds, however, that the promise made regarding Thompson's existing business is sufficiently definite to support a claim of promissory estoppel. There is also evidence from which a jury could conclude that Thompson justifiably relied on Campbell's representation. Accordingly, the court holds that, except to the extent that Thompson relies on the agreement concerning her existing clients, summary judgment is appropriate on her claim of promissory estoppel.

## 7. Defamation

■ Under Minnesota law, a plaintiff suing for defamation must plead and prove the defendant published a false statement of fact that concerns the plaintiff and tends to harm the plaintiff's reputation or to lower her in the estimation of the community. *Stuempges v. Parke–Davis & Co.,* 297 N.W.2d 252, 255 (Minn.1980) (citing *Restatement (Second) of Torts* §§ 558–59 (1977)). In the complaint, Thompson asserts that Campbell defamed her by telling Scott Froehlich that he was getting rid of her within a week. The complaint also alleges that Provident "has informed ... its employees and other third parties that the reason plaintiff was terminated was because of her alleged illegal business conduct."

■ Provident argues that Thompson's claim for defamation should be dismissed for lack of particularity. A defamation claim must be pled with a certain degree of specificity. *Pinto v. Internationale Set, Inc.,* 650 F.Supp. 306, 309 (D.Minn.1986); *Stock v. Heiner,* 696 F.Supp. 1253, 1260 (D.Minn. 1988). The fact that Thompson failed to recite the exact language spoken is not fatal to her defamation claim. *Stock,* 696 F.Supp. at 1260. Although the complaint is not a model of clarity, the court finds that it adequately identifies the false and defamatory statements as well as which defendants made the statements. The court holds that to the

extent the complaint alleges that defendants told Provident employees that Thompson engaged in illegal and improper conduct and gross misconduct, Thompson states a cognizable defamation claim.

Thompson also alleges in the complaint that Provident told "other third persons" that she was terminated because she engaged in illegal conduct. Thompson claims that she has been unable to obtain employment with other insurance companies because Provident made defamatory statements to others in the insurance industry. The court tends to agree with Provident that such a claim has not been pled with the requisite specificity. Moreover, Thompson has failed to present any facts which show that Provident made defamatory statements to others in the insurance industry. At her deposition, Thompson stated that she was a leading candidate for a job with Canada Life until a reference was sought from Provident. Thompson merely speculates that Provident must have defamed her because she was not hired by Canada Life and she has had difficulty in securing another job. Such speculation, however, cannot support a claim of defamation.

The scope of Thompson's defamation claim is limited to the allegations of the complaint. Thompson tries to broaden her claim by asserting in her memorandum that Campbell told Ted Williams and other Provident employees that she was "incompetent" and a "complainer" and a "troublemaker." Thompson cannot amend her defamation claim simply by making new allegations in her brief. The court notes that even if these allegations had been properly pled, the "complainer" and "troublemaker" statements would not be actionable. To be actionable, a defamatory statement must be specific and verifiable by reference to fact. *Lund v. Chicago & Northwestern Transp. Co.*, 467 N.W.2d 366, 369 (Minn.Ct.App.1991).

Whether a statement implies objective facts that may be defamatory is a question of law for the court to decide. *Id.* The statements that Thompson was a "complainer" and a "troublemaker," assuming they were made, relate to her personal traits and, as a matter of law, are too imprecise to be action-

able. *See McGrath v. TCF Bank Savings,* 502 N.W.2d 801, 808 (Minn.Ct.App.1993), *modified on other grounds,* 509 N.W.2d 365 (Minn.1993) (employer's statement that the employee was a "troublemaker" not actionable); *accord Lund,* 467 N.W.2d at 369 ("move ups," "shit heads," "brown nose" and "favoritism" not actionable although uncomplimentary); *Lee v. Metropolitan Airport Comm'n,* 428 N.W.2d 815, 821 (Minn.Ct.App. 1988) ("bitch," "fluffy" and flirtatious not actionable).

## A. Qualified Privilege

Defendants contend that any statements made to Provident employees concerning the reason for Thompson's dismissal fall within the qualified privilege afforded employers. Minnesota law "recognizes a qualified privilege which exempts an employer from liability for defamatory statements about an employee so long as the statements are made in good faith and for a legitimate purpose." *Brooks v. Doherty, Rumble & Butler,* 481 N.W.2d 120, 124–25 (Minn.Ct. App.1992) (citing *Stuempges,* 297 N.W.2d at 257). The communication may be privileged if "made upon a proper occasion, from a proper motive, and . . . based upon reasonable or probable cause." *Id.* at 125 (quoting *Stuempges,* 297 N.W.2d at 256–57). To establish the existence of the privilege, defendants bear the burden of proving the communication was: (1) made upon a proper occasion, (2) made from a proper purpose, and (3) based upon reasonable and probable grounds. *Id.*

Whether defendants had a proper purpose and a proper occasion in making the alleged communications are questions of law for the court to decide. *Brooks,* 481 N.W.2d at 125. The court finds that the communication of Provident's reason for discharging Thompson to its employees is an occasion protected by the qualified privilege. Provident also had a legitimate purpose to inform employees about the consequences of conducting outside business in violation of the conflict of interest policy.

Whether Provident and Campbell had reasonable and probable grounds for

making the statements is generally a question for the court, "unless the evidence 'permits of more than one conclusion,' then the question becomes one of fact for the jury." *Id.* (quoting *Wirig v. Kinney Shoe Corp.,* 461 N.W.2d 374, 380 n. 4 (Minn.1990)). Minnesota courts generally have found that reasonable and probable grounds exist as a matter of law only when "the evidence showed that investigative steps had been taken, including personal questioning of the affected employee, in an effort to ascertain the accuracy of statements made about the employee's conduct." *Wirig,* 461 N.W.2d at 380. Thompson argues that whether defendants had reasonable and probable grounds for making the statements must be decided by the jury because the evidence permits of more than one conclusion. The court agrees.

The court concludes that a reasonable jury could find that defendants failed to make an adequate investigation to support the statements that Thompson committed gross misconduct by engaging in other insurance business. The evidence indicates that Campbell intentionally kept silent about the agreement concerning Thompson's existing clients although he knew it was paramount to whether she was violating the conflict of interest policy. From Provident's perspective, the evidence supports the conclusion that it conducted an adequate investigation into whether Thompson was in fact engaged in such business. On the other hand, a jury could find that it was unreasonable for Provident to charge Campbell with investigating Thompson after he revealed his personal bias. Moreover, the evidence shows that Provident, once made aware of the agreement concerning Thompson's existing clients, took almost no steps to investigate. Provident did not even question Campbell about the agreement before terminating Thompson. The court concludes that a jury could find that defendants were was not entitled to a qualified privilege for making potentially defamatory statements about Thompson without reasonable and probable grounds.

■ Even if defendants were able to prove their entitlement to the qualified privilege as a matter of law, a factual issue concerning actual malice remains. Once defen-

dants establish the existence of the qualified privilege, the burden shifts to the plaintiff to prove that the defendant abused that privilege by actual malice. *Brooks,* 481 N.W.2d at 126. This question is for the jury. *Id.* Thompson may prove actual malice "by evidence that leads to an inference that [defendants] knew the statements were false, by extrinsic evidence of personal ill feeling, or by intrinsic evidence such as exaggerated language, the character of the language used, or the extent of the publication." *Id.* (citation omitted). Based on the present record, a jury could conclude that defendants knew the alleged statements were false; there is also evidence that demonstrates ill will on the part of Campbell and, to a lesser extent, Provident. Accordingly, the court concludes that the question of actual malice should be submitted to a jury.

### 8. Fraud

■ The elements of fraud are well established. To state a claim of fraud, Thompson must allege, with particularity, that:

> Defendants made a false representation of a past or present fact, susceptible of knowledge, knowing it to be false or without knowing whether it was true or false, with the intention of inducing the plaintiffs to act in reliance upon it or under such circumstances that plaintiffs were justified in so acting and was thereby deceived or induced to so act to their damage.

*Davis v. Re–Trac Mfg. Corp.,* 276 Minn. 116, 117, 149 N.W.2d 37, 38–39 (1967). Statements of future intent are actionable only where there is evidence that the speaker had no intent to perform at the time the statement was made and made the statement to accomplish the fraud. *Johnson Bldg. Co. v. River Bluff Dev. Co.,* 374 N.W.2d 187, 194 (Minn.Ct.App.1985) (citing *Vandeputte v. Soderholm,* 298 Minn. 505, 216 N.W.2d 144, 147 (Minn.1974)).

Thompson claims that defendants fraudulently induced her to accept a regional marketing representative position with Provident. According to Thompson, Provident, through Campbell, falsely represented that: (1) she could reasonably expect to make between $65,000 and $70,000 her first year with

Provident; (2) Provident would hire an assistant for Thompson's office within 6 months; (3) no additional marketing representatives would be hired in Thompson's territory for at least 2 years; (4) Thompson was hired as a manager to develop a six state territory and would receive an override on any additional representative's business; (5) Thompson would not have to turn over her brokers list to Provident without compensation; (6) Thompson could maintain and service her existing accounts; and (7) Thompson would have permanent employment with Provident if she successfully completed the initial 90 day probation period. The court assumes, as it must, that Provident, through Campbell, made the alleged statements.

■ Provident contends that Thompson cannot establish justifiable reliance as a matter of law. Justifiable reliance is generally a fact question. *St. Croix Printing Equipment, Inc. v. Rockwell Int'l Corp.*, 428 N.W.2d 877, 882 (Minn.Ct.App.1988). A court may find reliance on oral representations unjustifiable as a matter of law where written provisions explicitly state a fact completely contradictory to the claimed misrepresentation. *Johnson Bldg. Co.*, 374 N.W.2d at 194. Thompson contends that Provident made a false promise of permanent employment upon completion of a probationary period. The application form signed by Thompson stated that:

> Provident makes no representation that employment with the Company is for any specified term of years. While Provident's past record can be illustrated by a long-standing tradition of job security and loyalty to satisfactory employees, Provident reserves the right to terminate employees for the Company's best interest, for unsatisfactory job performance, for unsatisfactory attendance, for violation of Company rules and policies, because an individual's services become excess to the Company's staffing needs, or at the sole discretion of Provident.

The language in the application form is clear and unambiguous. It also unequivocally

states a fact "completely contradictory to the claimed misrepresentation." *Id.* Accordingly, the court concludes that insofar as Thompson's fraud claim rests on misrepresentations concerning the permanency of her employment, Thompson cannot prove reliance as a matter of law.

Provident also contends that most of the other representations merely stated opinions or predicted the future and therefore are not actionable. Provident concedes that a statement made with a preconceived and undisclosed intent of not acting consistent with the statement constitutes a misrepresentation of material fact. Provident insists, however, that there is no evidence which indicates that Provident did not intend to perform consistently at the time the representations were made. The court agrees.

Campbell allegedly projected that Thompson could reasonably expect to earn $65,000 to $70,000 during her first year with Provident. Thompson understood that her starting salary was $40,000 plus commissions, benefits and a company car.[16] While the benchmark set by Campbell may have been too optimistic, there is no evidence that it was a knowingly false statement of fact. Nor does the evidence show that Campbell should have known his projection was false. Thompson cannot show that defendants had no present intent to act consistently with the agreement authorizing her to maintain and service her existing accounts. Although Thompson was allegedly terminated for engaging in other insurance business, the evidence clearly shows that at the time she was hired, Campbell intended to permit Thompson to service certain existing accounts.

The evidence is also insufficient to show that Campbell's other statements were the product of deliberate or reckless deceit. There is no evidence that, at the time Thompson was hired, Campbell did not intend to hire an assistant for the Minneapolis office or that he planned to hire any additional representatives during the next 2 years. At his deposition, Campbell stated that he intended to hire other representatives in

---

**16.** The court also notes that Thompson indicated on the application form that her expected salary was negotiable.

Minnesota "in the years to come" as "business picked up" but that it was not on the agenda to do so at that time. .

During the interview, Campbell allegedly told Thompson she would not have to turn over her brokers list to Provident without compensation. Campbell recalls telling Thompson that it would not be fair for her to share her list with another representative and not receive some benefit. The evidence also shows that Campbell knew that Provident would require Thompson to turn over her brokers list. It is undisputed, however, that, although Campbell tried on several occasions, Provident never obtained Thompson's brokers list. The court concludes that there is simply no evidence that defendants harbored a present intent not to compensate Thompson if she provided her brokers list to Provident.

In sum, Thompson has failed to show that Provident did not intend to act consistently with the alleged representations when they were made. At most, the evidence shows that Provident, through Campbell, made representations as to future acts or events which did not take place. There is no factual basis to support a finding that the difference between Provident's alleged statements and its later actions was attributable to fraud.

██ There is one aspect of Thompson's fraud claim that survives summary judgment. Thompson alleges that Campbell misrepresented that she would receive an override on any other representative's business within her territory. At his deposition, however, Campbell stated that even if another representative was hired, he never expected Thompson to receive any compensation based on that representative's production. Based on Campbell's admission, a reasonable jury could find that defendants did not intend to perform consistently at the time the statement was made. A reasonable jury could also conclude that Thompson justifiably relied on Campbell's statement when she accepted the position with Provident. For the most part, the evidence concerning damages is highly speculative. Viewing the evidence in Thompson's favor, the court concludes that a reasonable jury could find she sustained

modest damages due to the alleged false representation.

## CONCLUSION

The court concludes that summary judgment is appropriate on Thompson's claims for sexual harassment, common law wrongful discharge and negligent retention. The court holds that Provident is entitled to partial summary judgment on Thompson's claims for breach of contract and promissory estoppel. Defendants are also entitled to partial summary judgment on the defamation and fraud claims. The court concludes that material issues of fact preclude summary judgment on Thompson's retaliation claim.

Based on the foregoing, **IT IS HEREBY ORDERED** that:

1. The motion of defendants Provident and Campbell for summary judgment on Thompson's sexual harassment claim is GRANTED;

2. The motion of Provident for summary judgment on Thompson's retaliation claim is DENIED;

3. The motion of Provident for summary judgment on Thompson's common law wrongful discharge claim is GRANTED;

4. The motion of Provident for summary judgment on Thompson's claim of negligent retention is GRANTED;

5. The motion of Provident for summary judgment on Thompson's claim for breach of contract is GRANTED in part and DENIED in part;

6. The motion of Provident for summary judgment on Thompson's claim for promissory estoppel is GRANTED in part and DENIED in part;

7. The motion of defendants Provident and Campbell for summary judgment on Thompson's claim for defamation is GRANTED in part and DENIED in part;

8. The motion of defendants Provident and Campbell for summary judgment on

Thompson's claim for fraud is GRANTED in part and DENIED in part.