Robert **MEMS**, Nathanial Khaliq, James Logan, Phillip Webb, Thurman Smith, and Byron Brown, Plaintiffs,

v.

**CITY OF SAINT PAUL—DEPARTMENT OF FIRE AND SAFETY SERVICES, Defendant.**

No. Civ. 97–1589/RHK/JMM.

United States District Court, D. Minnesota.

May 29, 1999.

Jeffrey R. Anderson and Karen A. Kugler, Reinhardt and Anderson, Saint Paul, Minnesota, for plaintiffs.

Frank E. Villaume III, Assistant City Attorney, Saint Paul, Minnesota, for defendant.

## MEMORANDUM OPINION
## AND ORDER

KYLE, District Judge.

### Introduction

The Plaintiffs in the instant case are six African–American firefighters who allege that they have suffered discrimination on the basis of their race while employed by the Defendant City of St. Paul ("St.Paul"). Specifically, the discrimination alleged by the Plaintiffs falls into two categories: (1) that the promotional examinations used by St. Paul had a disparate impact on African–American applicants, and (2) that the St. Paul Fire Department maintained a racially hostile work environment.[1] This case was previously before this Court on the Plaintiffs' motion for class certification, which the Court denied by Memorandum Opinion and Order dated January 30, 1998. Currently before the Court is the Defendant's Motion for Summary Judgment. For the reasons set forth below, the Court will grant the Defendant's Motion.

### Background[2]

*A. The 1994 Settlement Agreement*

Four of the six Plaintiffs—Robert Mems ("Mems"), Nathanial Khaliq ("Khaliq"), Thurman Smith ("Smith"), and Byron Brown ("Brown")—were parties to a lawsuit against the Defendant in 1992, which resulted in a settlement agreement [hereinafter, the "1994 Settlement Agreement"] between the parties on June 17, 1994. (*See* Jan. 30, 1998 Mem.Op. & Order at 3.) As a part of the 1994 Settlement Agreement, Mems, Khaliq, Smith and Brown agreed to release all claims against St. Paul arising prior to June 17, 1994. (*Id.*) The Plaintiffs do not dispute the validity of this settlement and release, but state that those Plaintiffs who were involved in the

previous case seek damages in the instant action arising only from the Defendant's conduct after June 17, 1994. (*Id.*) As part of the 1994 Settlement Agreement, Mems, Khaliq, Smith, and Brown agreed:

that they [would] in no way encourage, cooperate with, or provide information for, the prosecution of any additional claims related to alleged incidents of racial harassment involving the Saint Paul Fire Department which may have occurred prior to the date of this Settlement Agreement ("Incidents"). Plaintiffs [further agreed to] instruct their counsel not to use any information which is work-product and which is the property of the plaintiffs or subject to the attorney/client privilege owed to plaintiffs for the purpose of prosecuting claims related to any such alleged Incidents.

(*Id.*) (citing Villaume Aff.Ex. ¶ 17 (1994 Settlement Agreement).)

*B. Disparate Impact (Testing)*

St. Paul offered promotional examinations for the position of fire captain in 1988, 1990, 1993, and 1995. (*See* Kugler Aff.Ex. LL (Friedland report).) Each of these examinations contained a written component, failure of which would prevent an applicant from being considered for promotion, regardless of that applicant's performance on the rest of the examination. (*See id.*) In all, ten African–American applicants took at least one of the four examinations. (*See* Villaume Supplemental Aff.Ex. T at 2 (Brull Supplemental Report).)

Of the ten African–American applicants who took at least one of the four examinations, four passed the written component.

---

1. In its Memorandum of Law in Support of its Motion for Summary Judgment ("Def.'s Supp. Mem."), the Defendant argues that it is entitled to summary judgment on the Plaintiffs' claim that they were subjected to discriminatory discipline. (*See* Def.'s Supp.Mem. at 17–20.) The Plaintiffs did not address the issue of discriminatory discipline in their responsive memorandum or during oral argument.

The Court concludes, therefore, that they have abandoned this claim.

2. For purposes of this motion, the Court views the evidence and the inferences which may be reasonably drawn from it in the light most favorable to the Plaintiffs. *See Enterprise Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir.1996).

(*See* Villaume Supplemental Aff.Ex. T.) Of the 96 white applicants, 68 passed the written component. (*See id.*) Focusing on the 1995 written examination, 30 of the 64 (46.88%) applicants who took the test passed. (*See id.*) Only two of the seven (28.57%) African–American applicants passed the 1995 written examination, while 22 of the 44(50%) white applicants passed.[3] (*See* Villaume Aff.Ex. E.) Of the six Plaintiffs in the instant case, only Mems and Brown took the 1995 examination. (*See* Pls.' Mem. in Opp'n to Def.'s Mot. for Summ.J. at 35 ("Pls.' Opp'n Mem.").) Neither passed. (*Id.*) The Plaintiffs who did not take the 1995 examination allege that they did not do so because they felt that the tests were administered in a discriminatory manner. (*See id.* at 34–35.) Khaliq attempted to take the 1995 examination, but was not allowed to do so because he had not submitted his application on time, although he argues that white firefighters had been allowed to take such tests in the past after having submitted late applications. (*See* Kugler Aff.Ex. KK (Khaliq's Answers to Interrogs.).)

The Plaintiffs' expert witness, David L. Friedland ("Friedland"), examined the results of the four examinations and initially concluded that although the results of the written examination gave rise to "an inference that there is a real difference in performance between African Americans and Whites," none of the disparities in any particular examination reached a statistically significant level. (*See* Kugler Aff.Ex. LL at 8.)[4] Friedland later conducted an analysis of the four examinations together in which he combined into one generic "minority" category applicants who were African–American, Hispanic, or Native American. (Kugler Aff.Ex. MM (Apr. 27, 1999 Friedland Aff.).) Using this "combined analysis" of various groups, Fried-

land was able to come up with a sample size of fifteen applicants and, from that, concluded that the written examinations as well as the overall promotion criteria had a racially disparate impact that negatively affected the chances of promotion for minorities. (*See id.*)

St. Paul's expert, Harold P. Brull ("Brull") analyzed the same examination results and concluded that the sample size was too small to support any inference of disparate impact. (Villaume Aff.Ex. K (Brull report).) Brull concluded, after analyzing the examination results and Friedland's analyses, that there was "clearly no pervasive pattern or practice of discrimination in regards to the promotional process to the rank of Fire Captain in the St. Paul Fire Department" and that analysis of the results of the four examinations revealed "no pattern of adverse impact by recognized statistical tests." (Villaume Supplemental Aff.Ex. T at 4.)

### C. Hostile Work Environment (Disparate Treatment)

Five of the six Plaintiffs—Mems, Khaliq, Phillip Webb ("Webb"), Brown, and Smith—worked at Station 20, while the sixth Plaintiff—James Logan ("Logan")—worked at Station 10. Because the Plaintiffs were divided among two different workplaces, the Court will set forth the factual allegations separately.

#### 1. Station 20—Plaintiffs Mems. Khaliq, Webb, Brown, and Smith

The five Plaintiffs who worked at Station 20—Mems, Khaliq, Webb, Brown, and Smith—have alleged a litany of events that, when viewed together, they argue, constitute a racially hostile working environment. Only two of the events about which the Station 20 Plaintiffs complain

---

**3.** The numbers do not total 64 because, in addition to the 51 applicants who were either African–American or white, two were Hispanic, one was American Indian/Alaskan Eskimo, and ten were of unknown ethnicity. (*See* Villaume Aff.Ex. E.)

**4.** The only exception to Friedland's conclusion that none of the results reached a statistically significant level is the written component of the 1990 examination. (*See* Kugler Aff.Ex. LL at 8.) Only six African–Americans, however, took that examination. (*See id.* at 23.)

have overt racial connotations. The first such event was the presence of various racially-themed political cartoons in newspapers that were left laying around Station 20 in 1995 or 1996. (*See* Kugler Aff. Ex. R (copies of cartoons).) The cartoons, each of which appeared in the newspaper, "The Conservative Chronicle," deal with issues of affirmative action, voting rights, and funding of social programs, and endorse conservative viewpoints on each of these issues. (*See id.;* Khaliq Dep. at 83–84.) A representative example is a cartoon dealing with affirmative action that portrays a person labeled "Minorities" hanging off of a crutch that is labeled "Affirmative Action." (*See* Kugler Aff.Ex. R.) After Webb complained about the cartoons to his captain, no other racially-themed cartoons were found in Station 20. (*See* Webb Dep. at 142; Khaliq Dep. at 86; Brown Dep. at 90.)

The other event that may have an overtly racial significance is the alleged defacing of Khaliq's magazines, "Aljumuah," an Islamic magazine, and "American Legacy," which depicted an African–American child on its cover. (*See* Kugler Aff.Ex. Y (photographs of magazines).) Khaliq had left these two magazines laying out at Station 20 after his shift was over. (*See id.;* Kugler Supplemental Aff.Ex. 11 (complaint by Khaliq.).) When he returned to work the next day, he discovered that the cover of one of the magazines had been torn off and ripped into small pieces, the other magazine had grease on it, and both had been thrown in the garbage. (*See* Khaliq Dep. at 70–71.) After Khaliq filed a complaint alleging that he had suffered a "shocking act of racially motivated vandalism," (*see* Kugler Supplemental Aff.Ex. 11), Carter immediately began an investigation. (*See* Carter Dep. at 295.) Carter submitted the magazines to the St. Paul Police Department crime laboratory for fingerprint testing and interviewed all of the "A shift" personnel in an attempt to determine what had happened to the magazines and why. (*See id.* at 295, 300.) One of the "A shift" firefighters told Carter that he had wiped his hands on the cover of a magazine while he was talking on the telephone, but he was not sure if it was one of Khaliq's magazines. (*See id.* at 298–99.) Carter concluded that Khaliq's "Aljumuah" magazine had been unintentionally smeared with grease, and he was unable to come to any conclusion with regard to how or why the cover of Khaliq's "American Legacy" magazine had been ripped into pieces. (*See id.* at 299–300.) As a result, no disciplinary action was taken with regard to Khaliq's magazines. (*See id.* at 302.)

In addition to the above two events that may be characterized as overtly racial in character, the Station 20 Plaintiffs allege a series of events that, while not facially race-based, allegedly occurred because of their race. The specifics of their allegations follow.

(1) Smith alleges that, on August 30, 1994, he was the subject of a false report that he had been consuming alcohol. (*See* Smith Dep. at 35–37.) Smith was filling in for another firefighter, Pat McCardle ("McCardle"), when Frank Caruso ("Caruso"), a fellow firefighter, reported that Smith had been drinking. (*See id.* at 36–37.) Smith's district chief and Captain Rodney Bergstrom reported Caruso's complaint to Smith and, in Smith's words, "looked at [him], checked [him] out" and told him that they were convinced that he had not been drinking. (*See id.* at 37.) When the district chief and Captain Bergstrom told Smith that Caruso had made the complaint about him, they commented, "Well, you know Frank." (*Id.*) Smith was embarrassed by the incident and believed that it was racially motivated. (*See id.* at 41.) After the incident, McCardle no longer asked Smith to fill in for him on certain shifts, as had been his practice before the drinking accusation. (*See id.* at 46–51.)

(2) Smith also alleges that in the fall of 1996 he was the subject of a false report that he was in possession of crack cocaine, an allegation that resulted in a search of his locker. (*See* Smith Dep. at 66–70.) After a report by one of the fire captains

to the police that Smith might be in possession of crack cocaine, the police arrived at the station and conducted a consensual search of Smith's locker. (*See id.* at 67–68.) No drugs were found. (*See id.* at 67.)

(3) Over the course of a few days in February or March 1995, Mems discovered that the liner on his helmet was broken, a clasp on his pants had been torn off, and a pumping apparatus on his fire engine had been left at the wrong setting. (*See* Mems Dep. at 161–72.) Mems does not know how these things happened to his equipment, or who was responsible, but believes that somebody tampered with his equipment intentionally. (*See id.* at 166.) Mems was issued a new helmet and a new set of "turnout gear" after he discovered the damage. (*See id.* at 168–69.) St. Paul issues each firefighter a helmet and pants and replaces those items periodically when they become worn. (*See* Carter Dep. at 82.) After Mems alleged that the damage to his helmet was intentional, Assistant Chief Anthony Carter ("Carter") investigated and concluded that it was the result of normal wear. (*See id.* at 81–82.) Chief Bataglia investigated the damaged pants, and Carter investigated the pumping apparatus that had been left in the wrong position. (*See id.* at 85–89.)

(4) In the spring of 1996, a basketball hoop that had been put up by Webb and that was used primarily by African–American firefighters was vandalized on approximately three separate occasions. (*See* Brown Dep. at 47, 84; Smith Dep. at 59–60; Webb Dep. at 134; Khaliq Dep. at 77–78; Mems Dep. at 78–79.) The basketball hoop was not located on the Station 20 property but was adjacent to it, and members of the public as well as Station 20 firefighters used the hoop. (*See* Brown Dep. at 83, 85–86; Khaliq Dep. at 77; Webb Dep. at 133–35.) Carter testified that he "might have done some inquiries" about the cause of the damage, but no determination was ever made about how the basketball hoop was damaged. (*See* Carter Dep. at 322.)

(5) Both Webb and Khaliq allege that, during the spring of 1996, somebody tampered with their vehicles. Webb discovered that the lug nuts on his car had been loosened. (*See* Webb Dep. at 136–37.) Although he did not see anybody loosen them, does not know who did so, and concedes that he has no facts to support his belief other than the fact that he believes it occurred while he was at work, Webb believes that someone at Station 20 loosened the lug nuts intentionally. (*See id.*) Khaliq's car was scratched and his fender bent while it was parked in Station 20's parking lot. (*See* Khaliq Dep. at 74.) Khaliq does not know who caused the damage to his car or whether it was done accidentally or intentionally. (*See id.* at 74–75.)

(6) In January 1995, a directive was issued that ordered the "B shift" (on which four of the Plaintiffs worked) to leave Station 20 by 8:00 a.m., when their shift was over. (*See* Carter Dep. at 45–46, 74; Kugler Supplemental Aff.Ex. 2 (Jan. 30, 1995 Memo from Bataglia).) District Chief Bataglia issued the directive after receiving a complaint from the "A shift" that tensions were rising between the shifts, especially when the "A shift" arrived in the morning to relieve the "B shift." (*See* Kugler Supplemental Aff.Ex. 2.) Specifically, the "A shift" had complained to District Chief Verros, who in turn relayed the complaint to Bataglia, that the "B shift" had been "hanging around the station after being relieved by either staying in bed, working out, or being in the showers when the A-shift is attempting to complete their house duties." (*Id.*) After Mems and Khaliq filed a complaint about Bataglia's directive, Assistant Chief Carter rescinded it and told them that they would not be required to vacate Station 20 by 8:00 a.m. (*See* Carter Dep. at 51–52; Khaliq Dep. at 122.)

(7) At some point in 1995 or 1996, somebody posted a photograph on the Station 20 bulletin board of two white firefighters raising their middle fingers. (*See* Kugler Aff.Ex. O (photographs).) Next to it

somebody posted a note that read: "This is our position on the whole thing." (*Id.*) Some of the Plaintiffs believed that the photograph and accompanying note were a comment on the 1994 Settlement Agreement and were offended by it. (*See* Brown Dep. at 70; Mems Dep. at 155–56; Khaliq Aff. at 99; Webb Dep. at 142–45.)[5] Captain Michael Ness ("Captain Ness") received an oral reprimand for allowing the posting of the photograph, because he was the captain on duty when the posting occurred. (*See* Fuller Dep. at 23.) A letter of reprimand was placed in Captain Ness's personnel file for a period of approximately eighteen months to two years. (*See id.* at 41–42; Ness Dep. at 34–35.) Other than the oral reprimand to Captain Ness and accompanying letter in his personnel file, no disciplinary action was taken as a result of the posting of the photograph. (*See* Carter Dep. at 126.) There is no evidence of any other offensive photographs being posted on Station 20's bulletin board after Captain Ness was disciplined by the Fire Department.

(8) Beginning on June 30, 1995, firefighter Pat McCardle, who was a member of the "A shift" and who had previously relieved Webb immediately upon McCardle's arrival at Station 20, told Webb that he would no longer do so, and would only relieve him at 8:00 a.m., when the shift officially changed. (*See* McCardle Dep. at 8; Webb Dep. at 47–48, 64.) After McCardle told Webb that he would no longer relieve him upon arrival, Webb became angry and began yelling obscenities at McCardle. (*See* Kugler Supplemental Aff.Ex. 6 at 2 (Minnesota Department of Human Rights Memorandum of Findings).) As a result of the incident, Webb received an oral reprimand for violating the Fire Department's "Policy of Respect." (*See* Kugler Supplemental Aff.Ex. 5 (memorandum regarding oral reprimand).) The Minnesota Department of Human Rights conducted an investigation into the incident and found that, although there was no probable cause to show that the actions of either Webb or McCardle were racially motivated, there was probable cause to show that McCardle's conduct was motivated by retaliation for the disciplinary action taken against Captain Ness and for the 1994 Settlement Agreement. (*See id.* at 1.) With regard to McCardle's refusal to continue relieving Webb immediately upon arrival at Station 20, Assistant Chief Carter concluded that there was no evidence that it was racially motivated, and that there was insufficient evidence of a retaliatory motive to support any type of disciplinary action. (*See* Kugler Supplemental Aff.Ex. 8 (letter from Carter to McCardle).) No disciplinary action was taken against McCardle. (*See id.*)

(9) In May 1996, Assistant Chief Carter had a telephone conversation with Webb in which he perceived Webb as being insubordinate and aggressive. (*See* Carter Dep. at 218; Webb Dep. at 97–99.) Carter directed Webb to meet with him at his office, and the two continued their conversation at Carter's office. (*See id.*) During the conversation at Carter's office, Webb began talking about an incident in Mississippi in which a disgruntled fire department employee shot and killed four people at the fire department headquarters. (*See* Webb Dep. at 100; Carter Dep. at 221.) Immediately after their conversation, Webb saw a doctor because of work-related stress. (*See* Webb Dep. at 102–03.) After the doctor diagnosed him as suffering a "work related acute stress reaction" which rendered him unable to work for approximately three days, Webb went on leave. (*See id.; see also* Doctors Certifi-

---

**5.** In addition to the photograph of the two white firefighters raising their middle fingers and the accompanying note, somebody had posted a photograph of Jim Wieczorek, a white firefighter, with the caption, "Hi, I'm stupid." (*See* Kugler Aff.Ex. O.) Although most of the Plaintiffs testified that they were not offended by the photograph of Wieczorek or accompanying caption, Mems testified that he objected to and was offended by both. (Mems Dep. at 155–56.) Other than the fact that it had nothing to do with official business but was posted on the bulletin board, it is not clear why Mems was offended by the photograph of Wieczorek and accompanying caption.

cate (attached to Webb Dep.).) Shortly after his conversation with Webb, Carter ordered Webb to undergo a psychological examination known as a "fitness for duty" examination because he was concerned about his state of mind and because he wanted to assure himself that Webb "would not be a harm to himself or any other members of the department." (Carter Dep. at 218, 226.) Mark Robertson, the assistant director of human resources, arranged for Webb to be examined by Dr. Gary Fischler ("Dr.Fischler"). (See Carter Dep. at 226–27.) Dr. Fischler concluded that Webb was not unfit for duty. (Carter Dep. at 238.) Webb suffered no reduction in salary, demotion, or reassignment as a result of his conversation with Carter, his stress leave, or the psychological examination that Carter ordered him to undergo. (See Webb Dep. At 110–11.)

(10) In the winter of 1997–1998, District Chief Verros ordered Mems and Brown to wear full turnout gear when responding to fires, although the common practice in the fire department had been for fire equipment operators not to wear full turnout gear in those situations. (See Brown Dep. at 72–73; Mems Dep. at 68–69.) Brown testified that, after he received District Chief Verros's directive, he saw white fire equipment operators at fires wearing less than their full turnout gear. (Brown Dep. at 79.) According to District Chief Verros, it is his practice to remind all fire equipment operators, regardless of their race, to wear full turnout gear when responding to fires. (Verros Aff. ¶¶ 3, 5.)

(11) In addition to these complaints, the Plaintiffs allege a variety of events at Station 20 that appear even less significant, such as other firefighters leaving the windows open in the winter, misplacing kitchen items, and turning the heat in Station 20 either too high or too low. (See Pls.' Opp'n Mem. at 4.)

### 2. Station 10—Plaintiff Logan

Logan has worked at Station 10 for approximately 15 years. (See Logan Dep. at 33.) He alleges that during that time, he has often been passed over for "out-of-

title" work, which is any work that a firefighter does outside of that person's regular duties. (See Logan Aff. ¶¶ 2–3; Pls.' Opp'n Mem. at 12.) Logan alleges that, although he was selected for out-of-title work at times, he was bypassed many other times. (See Logan Aff. ¶¶ 2–3.) Logan has presented evidence of one specific occasion when he was initially bypassed for out-of-title work, although ultimately he was selected for the work. In early 1997, Captain Wieczorek told Logan that he was going to select another firefighter for out-of-title work. (See Logan Dep. at 115–17.) After Logan expressed his opposition to being passed over, Captain Wieczorek called the district chief and, after speaking with the district chief, selected Logan for the out-of-title work. (See id. at 117–18.) Logan also alleges that on one occasion he was passed over for out-of-title work as a captain in Station 8 and later overheard two other firefighters saying that the reason he was not selected was that the firefighters in Station 8 would not work for "nigger captains." (See id. at 86.) Logan is not sure when this conduct occurred. (See id. at 89.)

In addition to his complaints about being passed over on many occasions for out-of-title work, Logan alleges that he was subjected to racial slurs during his employment. As evidence of these racial slurs, Logan has presented the deposition testimony of firefighter Steve Sarafolean ("Sarafolean"), who worked at Station 10 until June 1997. Sarafolean testified that, while he.did not know of any racial slurs being directed at Logan, he was aware that other firefighters had used racial slurs in Logan's presence. (See Sarafolean Dep. at 9–10.) Sarafolean testified that such slurs were made "[n]ot that often," "less than once a month," and roughly about once every other month. (Id.) At some point during his career, Logan overheard Sarafolean make a remark to his children (who were wearing uniforms with "St. Luke's" inscribed on them), "What have we got here, St. Luke's spooks?" (Sarafolean Dep. at 30.) Logan has presented evidence

of one recent race-based statement that occurred in early 1999, while he and Captain Wieczorek were responding to an emergency call. (*See* Logan Dep. at 77.) Captain Wieczorek told a woman to "put on a robe because a black man was coming upstairs." (*Id.* at 77, 79.)

## Analysis

### A. Standard of Review

Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The Court views evidence and the inferences in which may be reasonably drawn from it in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir.1996); *see also Adkison v. G.D. Searle & Co.*, 971 F.2d 132, 134 (8th Cir.1992). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank*, 92 F.3d at 747; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The nonmoving party must demonstrate the existence of specific facts that create a genuine issue for trial; mere allegations or denials are not enough. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir.1995). Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *See Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. at 2511.

On a motion for summary judgment, the court does not weigh facts or evaluate the credibility of affidavits and other evidence. The nonmovant, however, cannot avoid summary judgment in favor of the movant merely by pointing to some alleged factual dispute between the parties. Instead, any fact alleged to be in dispute must be "outcome determinative under prevailing law," that is, it must be material to an essential element of the specific theory of recovery at issue. *See Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir.1992) (citation omitted). Essentially, the court performs the threshold inquiry of determining whether there is a need for a trial. *Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. at 2510.

### B. Disparate Impact Claim

Title VII prohibits employers from using employment practices that, while neutral on their face, have the impact or effect of discriminating against a protected class. *See Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 645, 109 S.Ct. 2115, 2118–19, 104 L.Ed.2d 733 (1989); 42 U.S.C. § 2000e–2(k).[6] Disparate impact claims challenge "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Smith v. City of Des Moines*, 99 F.3d 1466, 1469 (8th Cir.1996) (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609, 113 S.Ct. 1701, 1705, 123 L.Ed.2d 338 (1993)). To prove discrimination under this theory, "a plaintiff must identify [and] challenge a facially neutral employment practice, demonstrate a disparate impact upon the group to which he or she belongs, and prove causation." *Lewis v. Aerospace Community Credit Union*, 114 F.3d 745, 750 (8th Cir.1997) (citation omitted), *cert. denied*, 523 U.S. 1062, 118 S.Ct. 1392, 140 L.Ed.2d 651 (1998). For a prima facie case, a plaintiff "must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused" the adverse employment consequences to employees because of their membership in a protected group. *Id.* Al-

---

**6.** Because Minnesota courts look to Title VII case law in interpreting the MHRA, the Plaintiffs' state law claims need not be analyzed separately from their federal claims. *See Carter v. Chrysler Corp.*, 173 F.3d 693, 700 n. 5 (8th Cir.1999); *Hanenburg v. Principal Mut. Life Ins. Co.*, 118 F.3d 570, 574 (8th Cir. 1997); *Sigurdson v. Isanti County*, 386 N.W.2d 715, 719 (Minn.1986).

though a plaintiff proceeding under a disparate *treatment* theory must show discriminatory intent, "intent is irrelevant to a disparate impact theory." *Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1484 (9th Cir.1993) (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986–87, 108 S.Ct. 2777, 2784–85, 101 L.Ed.2d 827 (1988)).

■ To prove that the promotional examinations had a disparate impact on African–American applicants, the Plaintiffs rely on their statistical evidence that white applicants passed the test with a greater frequency than African–American and minority applicants. Although the Plaintiffs correctly note that the proportional disparity shown by the results of some of the examinations would be sufficient to raise an inference of disparate impact if the sample sizes were large enough, they do not adequately refute the Defendant's argument that the statistics are insignificant because of the small sample size. (*See* Def.'s Supp.Mem. at 12–14.) As noted above, only ten African–Americans took at least one of the four examinations that are being challenged in the instant case. (*See* Villaume Supplemental Aff.Ex. T at 2 (Brull Supplemental Report).)

The Eighth Circuit has held that where the sample size of a group in a statistical analysis is too small to be statistically significant, a plaintiff cannot rely on those statistics alone to support a claim of disparate impact. *See Lewis*, 114 F.3d at 750 (sample size of three too small to support a disparate impact claim); *Coble v. Hot Springs Sch. Dist. No. 6*, 682 F.2d 721, 730 (8th Cir.1982) (collecting cases); *Harper v. Trans World Airlines, Inc.*, 525 F.2d 409, 412 (8th Cir.1975) (in a case dealing with a sample size of five, concluding that "statistical evidence derived from an extremely small universe, as in the present case, has little predictive value and must be disregarded"); *see also Mayor of the City of Phila. v. Educational Equality League*, 415 U.S. 605, 621, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630 (1974) (rejecting as "meaningless" racial composition statistics because,

among other problems, the sample size was thirteen); *Shutt v. Sandoz Crop Protection Corp.*, 944 F.2d 1431, 1433 (9th Cir.1991) (reversing district court's judgment because, among other reasons, it "reached its conclusion as to discriminatory impact by looking at an exceedingly small class of employees" numbering 21); *MacDissi v. Valmont Indus., Inc.*, 856 F.2d 1054, 1058 (8th Cir.1988) (explaining that statistical evidence for a disparate impact claim must be stronger than circumstantial evidence to support a disparate treatment claim; and citing disparate impact cases in which courts have rejected statistical samples based on sample sizes larger than nine).

In the instant case, the Plaintiffs have failed to show how the statistical evidence that they have produced differs from that rejected by the Eighth Circuit in the above cases. They have not cited to any cases in which statistical evidence based on a sample size as small as ten has been held to be sufficient to prove a disparate impact claim. The Plaintiffs, in fact, do not cite to any case law at all in the section of their memorandum dealing with statistical evidence and the alleged adverse effect of the promotional examinations on African–American applicants. (*See* Pls.' Opp'n Mem. at 36–38.)

The Court is cognizant of the fact that an overly rigid focus on statistical significance and a requirement that a sample size be sufficiently large would lead to the unjust result that an employer with very few employees in a particular protected group is somewhat immunized from liability on a disparate impact theory. (*See* Pls.' Opp'n Mem. at 38.) In *MacDissi*, the Eighth Circuit raised the same issue, cautioning that an overly strict adherence to this approach "would unjustifiably deny employees in smaller workplaces the protection of federal discrimination law." *MacDissi*, 856 F.2d at 1058. Even taking this consideration into account, however, the Court finds that prior case law on this issue is clear and unequivocal. The Plaintiffs have directed the Court to no cases from this jurisdiction or any other in which

sample sizes as small as they propose have been used to support a statistical inference of disparate impact. It is conceivable that, in a situation involving certain egregious circumstances, a disparate impact plaintiff could could present statistical evidence that, but for the small sample size, could give rise to a reasonable inference of racially disparate impact. The Court finds that the instant case, however, does not present any such egregious circumstances and does not present a factual scenario that could justify an exception to the requirement that statistics purporting to show disparate impact be based on a study involving a statistically significant sample size.

Recognizing that the number of African–American applicants taking the examinations is so small as to render the results statistically insignificant, the Plaintiffs' expert grouped several minority groups together for purposes of analyzing the results. (Kugler Aff.Ex. MM.) This "grouping" approach, however, has been flatly rejected by at least one court of appeals, see *Rich v. Martin Marietta Corp.*, 522 F.2d 333, 346 (10th Cir.1975), and appears to contravene the requirement that the disparate impact plaintiff "demonstrate a disparate impact *upon the group to which he or she belongs* ...." *Lewis v. Aerospace Community Credit Union*, 114 F.3d 745, 750 (8th Cir. 1997) (emphasis added). The Plaintiffs offer no legal argument with regard to why *Rich* was either wrongly decided or distinguishable, or with regard to why their "grouping" approach is either statistically sound or legally relevant. Although the Court does not conclude that such an approach would never be appropriate, the Plaintiffs have failed to show why it would be appropriate in the instant case, and the Court concludes that its use would be unwarranted.

In the absence of any showing by the Plaintiffs that the instant case is distinguishable from case law precluding reliance solely on statistics derived from such a small sample size, the Court finds that the Plaintiffs have failed to present any evidence that the promotional examinations in question have had a racially disparate impact on promotions within the Fire Department. Accordingly, the Court will grant the Defendant's Motion for Summary Judgment with regard to the Plaintiffs' disparate impact claim.

### C. Hostile Work Environment Claim

The Plaintiffs allege that they have been subject to a racially hostile work environment while working for St. Paul, in violation of Title VII and the MHRA. St. Paul argues, *inter alia*, that the Plaintiffs have failed to establish the elements of a *prima facie* case of racial discrimination under either Title VII or the MHRA because the alleged harassment was not sufficiently severe or pervasive and, therefore, that it is entitled to summary judgment on this claim. (*See* Def.'s Supp.Mem. at 31–34.)

█ In order to establish a prima facie case of a racially hostile work environment, the Plaintiffs must show: (1) their membership in a protected group; (2) the occurrence of unwelcome harassment; (3) a causal nexus between the harassment and their membership in the protected group; (4) that the harassment affected a term, condition, or privilege of their employment; and (5) that St. Paul knew or should have known of the harassment in question and failed to take prompt and effective remedial action. *See Carter v. Chrysler Corp.*, 173 F.3d 693, 1999 WL 225405, *5 (8th Cir. Apr.20, 1999); *see also Thompson v. Campbell*, 845 F.Supp. 665, 673 (D.Minn.1994); *Williams v. Metropolitan Waste Control Comm'n*, 781 F.Supp. 1424, 1426 (D.Minn.1992) (citing *Minneapolis Police Dep't v. Minneapolis Comm'n on Civil Rights*, 402 N.W.2d 125, 131 (Minn.Ct.App.1987), *aff'd*, 425 N.W.2d 235 (Minn.1988)).[7] Because the Plaintiffs

---

7. Although the MHRA explicitly provides that it is a form of *sexual* harassment for an employer to allow a sexually hostile work environment, *see* Minn.Stat. § 363.01, subd. 41, it includes no similar provision with regard to a *racially* hostile work environment. The Court

have failed to create a genuine issue of material fact with regard to the fourth element above, the Court will grant summary judgment to St. Paul on this claim.[8]

As an initial matter, the Court is compelled to address—but not resolve—the issue of the applicability *vel non* of the continuing violation doctrine. The Plaintiffs have asserted claims under both Title VII and the MHRA. Title VII requires a plaintiff to file a charge of discrimination with the EEOC within 300 days from the date of the allegedly discriminatory act,[9] and the MHRA imposes a slightly longer, one-year period of limitations. *See* 42 U.S.C. § 2000e–5(e)(1); Minn.Stat. § 363.06, subd. 3; *see also Mandy v. Minnesota Mining & Mfg.*, 940 F.Supp. 1463, 1468 (D.Minn.1996). The continuing violation doctrine allows a plaintiff to recover for acts of discrimination that occurred prior to the applicable period of limitations if such acts are related to other acts of discrimination that occurred within the period, and if the acts together constitute a "continuing pattern of discrimination." *Mandy*, 940 F.Supp. at 1468. The Eighth Circuit has described the doctrine as follows:

> When an employer is accused of an ongoing practice that began prior to the statute of limitations period, the claim may nonetheless be timely under the "continuing violation" doctrine. The employee may challenge ongoing discriminatory acts even if similar illegal acts could have been challenged earlier and are thus time-barred.... *Relief back to the beginning of the limitations period strikes a reasonable balance between permitting redress of an ongoing wrong and imposing liability for conduct long past.*

*Gipson v. KAS Snacktime Co.*, 83 F.3d 225, 230 (8th Cir.1996) (quoting *Ashley v. Boyle's Famous Corned Beef Co.*, 66 F.3d 164, 167 (8th Cir.1995) (en banc)). In other words, a plaintiff must show that at least one incident occurred within the relevant limitations period in order to apply the continuing violation doctrine. *See Giuliani v. Stuart Corp.*, 512 N.W.2d 589, 595 (Minn.Ct.App.1994).

In the instant case, the Court need not resolve the question of whether the Plaintiffs are entitled to the benefit of the continuing violation doctrine. Assuming arguendo that the doctrine applies, and that each of the Plaintiffs' allegations—no matter how distant in time—is relevant to the hostile work environment inquiry, the Court concludes that they have failed to create a genuine issue of material fact with regard to whether the alleged harassment

---

7. concludes, however, that the MHRA's prohibition on race-based discrimination in the terms or conditions of employment provides a cause of action for a racially hostile work environment. *See Brantley v. Independent Sch. Dist. No. 625*, 936 F.Supp. 649, 657–58 (D.Minn. 1996) (analyzing racially hostile work environment claim under both Title VI and the MHRA); *see also Laffey v. Independent Sch. Dist. No. 625*, 806 F.Supp. 1390, 1401 (D.Minn.1992) (same), *aff'd*, 994 F.2d 843 (8th Cir.1993). As in *Brantley*, the Court will apply case law developed in the sexually hostile work environment context to the Plaintiffs' MHRA claim. *See also Gipson v. KAS Snacktime Co.*, 171 F.3d 574, 578 (8th Cir. 1999) ("The same standards are generally used to evaluate claims of hostile work environment based upon sexual harassment and racial harassment.").

8. Because the Plaintiffs have failed to satisfy the fourth element of their hostile work envi-

---

ronment claim, the Court need not address the question of whether St. Paul knew or should have known of the harassment and failed to take prompt and effective remedial action. It also need not resolve whether the Plaintiffs have satisfied the third element—whether there existed any causal nexus between the harassment and the Plaintiffs' race. Although the Court recognizes that such harassment "need not be explicitly [racial] in nature" to be relevant under Title VII, *see Carter*, 173 F.3d 693, 701, the vast majority of the Plaintiffs' allegations have no apparent connection to the fact that the Plaintiffs are African–American.

9. In certain types of cases factually distinct from the instant case, Title VII imposes a 180–day period of limitations. *See* 42 U.S.C. § 2000e–5(e)(1).

was sufficiently severe or pervasive to alter the conditions of their employment.

■ To establish that the harassment affected a term, condition, or privilege of their employment, the Plaintiffs must show that it was "sufficiently severe or pervasive as to alter the conditions of [their] employment and create an abusive working condition." *Thompson*, 845 F.Supp. at 673 (quoting *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986)); *see also Carter*, 173 F.3d 693, 701. "A workplace permeated with discriminatory intimidation, ridicule, and insult is sufficiently severe to establish a hostile work environment." *Kimzey v. Wal–Mart Stores. Inc.*, 107 F.3d 568, 573 (8th Cir.1997) (citations and internal quotation marks omitted). "Sporadic or casual comments," however, "are unlikely to support a hostile environment claim." *Carter*, 173 F.3d 693, 701 (citing *Cram v. Lamson & Sessions Co.*, 49 F.3d 466, 474 (8th Cir.1995), and *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1257 (8th Cir.1981)). The Plaintiffs must present evidence showing that a reasonable person would consider the harassment "sufficiently pervasive to create an abusive working environment." *Thompson*, 845 F.Supp. at 673; *see also Hathaway v. Runyon*, 132 F.3d 1214, 1221 (8th Cir.1997) ("Title VII does not ... create a cause of action for all unpleasant or abusive behavior in the workplace.").

In addition to this objective standard, the Plaintiffs must satisfy a subjective standard, and show that the harassment in question had such an effect on them. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998); *Kennedy v. GN Danavox*, 928 F.Supp. 866, 871–72 (D.Minn.1996); *Callanan v. Runyun*, 903 F.Supp. 1285, 1297 (D.Minn.1994) (recognizing that a hostile work environment claim has "both an objective and a subjective component") (Kyle, J., adopting the report and recommendation of Erickson, Mag. J.), *aff'd*, 75 F.3d 1293 (8th Cir.1996). Whether conduct is sufficiently severe or pervasive to create a

hostile work environment is determined from the totality of the circumstances surrounding the harassment. *See Jenson v. Eveleth Taconite Co.*, 824 F.Supp. 847, 874 (D.Minn.1993). In making this determination, a court considers factors such as "the frequency of the ... conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Thompson*, 845 F.Supp. at 673–74 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993)). In *Callanan*, the court considered the plaintiff's claim of a sexually hostile work environment and concluded that she had not shown conduct that was "sufficiently patterned or pervasive to be actionable as a hostile environment claim." *Callanan*, 903 F.Supp. at 1297–98.

■ Although the Defendants do not argue that the Plaintiffs have failed to create a genuine issue of material fact with regard to the question of whether they *subjectively* perceived their environment to be hostile or abusive, each of the Plaintiffs has failed to satisfy the *objective* component. This objective component to a hostile work environment claim requires a plaintiff to show that a reasonable person would consider the harassment "sufficiently pervasive to create an abusive working environment." *Thompson*, 845 F.Supp. at 673 (quoting *Meritor Savings Bank*, 477 U.S. at 67, 106 S.Ct. at 2405). In the instant case, the Plaintiffs' allegations are isolated, sporadic, and—in many cases—trivial. The factual allegations of the Plaintiffs fall far short of the threshold set by the Eighth Circuit for establishing a hostile work environment claim. *See, e.g., Kline v. City of Kansas City, Mo., Fire Dep't*, 175 F.3d 660, 668–69 (8th Cir.1999); Carter, 173 F.3d 693, 1999 WL 225405, at *6–*7; *Gipson v. KAS Snacktime Co.*, 171 F.3d 574, 578–80 (8th Cir.1999); *Smith v. DataCard Corp.*, 9 F.Supp.2d 1067, 1077–80 (D.Minn.1998); *Laffey v. Independent Sch. Dist. No. 625*, 806 F.Supp. 1390, 1401

**1044**

(D.Minn.1992), *aff'd,* 994 F.2d 843 (8th Cir. 1993); *Williams v. Metropolitan Waste Control Comm'n,* 781 F.Supp. 1424, 1426–27 (D.Minn.1992). In *Callanan,* a sexually hostile work environment case, the plaintiff presented a litany of factual allegations, some of which were explicitly sexual and some of which were not. In granting summary judgment to the defendant, the court in *Callanan* concluded:

> When viewed in the context of the two-year period in which these events occurred, it may not be legitimately said that the objectionable conduct permeated the workplace, or was so serious or pervasive as would draw a reasonable person to conclude that the work environment to which Callanan was exposed was hostile or abusive. While not unmindful that the conduct in question need not be explicitly sexual in nature, the conduct must, nonetheless, be sufficiently patterned or pervasive to be actionable as a hostile work environment claim. *Kopp v. Samaritan Health System, Inc.,* 13 F.3d 264, 269 (8th Cir. 1993), citing *Hall v. Gus Construction Co., Inc.,* 842 F.2d 1010, 1014 (8th Cir. 1988). Here, we find no such patterned or pervasive practice.

*Callanan,* 903 F.Supp. at 1298. Evaluation of whether a plaintiff has presented evidence sufficient to support a hostile work environment claim is necessarily a fact-specific inquiry. In the instant case, as in *Callanan,* the Plaintiffs have failed to allege a course of conduct on the part of St. Paul or its employees that is sufficiently severe or pervasive to alter the conditions of their employment and create an abusive working condition. Accordingly, the Court will grant summary judgment to St. Paul on the Plaintiffs' hostile work environment claim.

### Conclusion

For the foregoing reasons, and based upon all of the files, records and proceedings herein, **IT IS ORDERED** that the Defendant's Motion for Summary Judgment (Doc. No. 51) is **GRANTED,** and the Plaintiffs' Complaint is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**