# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 19-3272

———————————————

Dr. Gregory Sherr

*Plaintiff - Appellant*

v.

HealthEast Care System; Dr. Margaret Wallenfriedman; Dr. Mary Beth Dunn; Dr. Richard Gregory; Dr. Stephen Kolar

*Defendants - Appellees*

Dr. Jerone D. Kennedy; Archie Defillo; CentraCare Health System

*Defendant*s

——————————

Appeal from United States District Court
for the District of Minnesota

——————————

Submitted: October 21, 2020
Filed: June 2, 2021

——————————

Before BENTON, SHEPHERD, and KELLY, Circuit Judges.

——————————

KELLY, Circuit Judge.

In September 2016, Dr. Gregory Sherr filed suit against HealthEast Care System (HealthEast), CentraCare Health, Dr. Margaret Wallenfriedman, Dr. Mary

Beth Dunn, Dr. Richard Gregory, Dr. Stephen Kolar, Dr. Jerone D. Kennedy, and Archie Defillo, asserting multiple causes of action. After the district court[1] granted the defendants' motions for judgment on the pleadings, three claims remained against HealthEast and Drs. Wallenfriedman, Dunn, Gregory, and Kolar (collectively, the Appellees): defamation, tortious interference with prospective economic relationship, and tortious interference with contract.

The Appellees moved for summary judgment on all of Dr. Sherr's remaining claims. The district court granted their motion, and Dr. Sherr now appeals that decision. We affirm.

I.

Dr. Sherr is a neurosurgeon who practiced medicine in Minnesota from 2010 to 2016. In November 2014, he entered into a one-year employment contract with Midwest Spine and Brain Institute (MSBI). In January of the following year, Dr. Sherr applied for clinical privileges to perform surgery at hospitals owned by HealthEast, a regional healthcare provider and hospital management company. HealthEast granted Dr. Sherr temporary privileges on February 3, 2015, and full privileges on April 30, 2015. Dr. Sherr also maintained clinical privileges with several other Minnesota hospitals during this time.

Two years before Dr. Sherr began his relationship with HealthEast, Drs. Wallenfriedman, Dunn, and Gregory (collectively, the Neuro Group) entered into contracts with HealthEast to become in-house neurosurgeons. Under the terms of these contracts, the doctors' compensation structures were linked to the number of procedures they performed. The contracts also stated that HealthEast patients who required specialized services would be referred to specialists within the HealthEast

---

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

network.  All three members of the Neuro Group were working under these contracts when Dr. Sherr began at HealthEast.

In September 2014, Dr. Wallenfriedman was elected the Chair of HealthEast's Spine Council, beginning a three-year term. The Spine Council was one of at least a dozen clinical councils established at HealthEast. Composed of practitioners with clinical privileges in designated specialty areas, the councils were responsible for setting policies for and evaluating the performances of HealthEast members who worked in those areas.  As part of their duties, the Spine Council members held monthly meetings to review issues related to HealthEast's spine care practice.  The Spine Council also began generating regular Spine Quality Reports.  These reports tracked the number of spine surgery patients at HealthEast hospitals who were readmitted for surgical site infections within thirty days after surgery and provided anonymized information on the doctors associated with those readmissions.

The Spine Council was also responsible for conducting peer review of spine surgeries performed at HealthEast hospitals.  During the period in question, this review process was dictated by HealthEast's Practitioner Peer Review Policy (the Policy).  Under the Policy, designated HealthEast staff members, including those serving on the clinical councils, identified cases for potential peer review from a number of sources, among them electronic reports and referrals from physicians, nurses, and other HealthEast employees.  Once identified, peer review cases were assigned to practitioner reviewers, who reviewed the cases and documented their findings on a Peer Review Form.  Based on the reviewer's recommendation, the relevant clinical council might then hold a peer review committee meeting to discuss the cases.  The Policy indicated that the Chair of that council "must facilitate the practitioner peer review committee meetings to ensure a fair and objective evaluation of individual practitioner performance and to ensure reasonable actions are taken based on assessment findings."  However, the Policy gave the Chair discretion for how to ensure a fair process, including whether competitors of the physician under review could participate in the process, whom to invite to the

-3-

meetings, and whether to request a written or in-person response from the physician under review.

At the close of a peer review process, the reviewers made a final determination on next steps, decided by consensus. One option was to refer the case to HealthEast's Medical Executive Committee (MEC) for consideration of corrective action. In its consideration, the MEC was guided by HealthEast's bylaws, which stated, in relevant part: "Whenever a practitioner's conduct requires that immediate action be taken to . . . reduce the substantial likelihood of immediate injury or damage to the health or safety of any patient . . . the Chief Executive Officer, or designee . . . shall have the authority to summarily suspend the . . . clinical privileges of such practitioner."

Dr. Sherr began operating at HealthEast hospitals in early 2015. At that time, Dr. Daniel Sipple was the director of HealthEast's Spine Center. In this role, Dr. Sipple referred HealthEast patients to neurosurgeons within the HealthEast network. Dr. Sipple preferred to refer more complex cases to doctors not in the Neuro Group—and specifically referred a number of patients to Dr. Sherr. The Neuro Group was unhappy with Dr. Sipple's approach and complained to him frequently. They also made comments about Dr. Sherr specifically, allegedly calling him a "hack," "not a good surgeon," an "asshole," and "the worst goddamn surgeon." In his deposition testimony, Dr. Sherr said that members of the operating room staff at HealthEast told him that the Neuro Group had made similar comments to them, calling Dr. Sherr "not a good doctor" and a "dangerous surgeon" and suggesting that he put patients at risk by operating too quickly, losing excessive amounts of blood during surgery, and having high infection rates. Dr. Sherr claims these comments were driven by professional jealousy and anticompetitive motives.

At her deposition, Dr. Wallenfriedman explained that at some point in the first half of 2015 an operating room nurse approached her to discuss the nurse's concerns about Dr. Sherr. The nurse told Dr. Wallenfriedman that the operating room staff had "filled out multiple safety event reports" concerning Dr. Sherr's surgeries and

wanted to ensure that the HealthEast administration was aware of these reports. In response, Dr. Wallenfriedman sent an email to HealthEast's head of surgery, Dr. Andrew Fink, containing a list of cases the nurse identified. The list consisted of six of Dr. Sherr's patients from April and May who had suffered post-operative infections. Between June and early August, Dr. Wallenfriedman sent Dr. Fink four additional emails, identifying other cases of Dr. Sherr's in which complications had arisen. Dr. Fink forwarded all of these emails to Dr. John Kvasnicka, who worked in HealthEast's Quality Department, and Nurse Ellen Fletcher, a peer review specialist.

Similar concerns about Dr. Sherr's surgeries emerged from two additional sources that summer. First, on June 11, Nurse Annette Lund, an infection prevention specialist, emailed Dr. Peter Bornstein, who worked in the Infection Prevention and Control department. She detailed concerns from members of the operating room staff about the number of Dr. Sherr's patients who had developed infections, suffered blood loss, and required redo procedures. Second, the Spine Quality Report for February to April 2015 indicated that four out of eighty of Dr. Sherr's spinal fusion patients over that period had "deep surgical site infections," as compared to seven surgical site infections for spinal fusion at all of HealthEast in 2014. Dr. Bornstein sent Dr. Sherr a letter with this information on June 18, 2015, though no additional action was taken at that time.

In light of this information, HealthEast initiated peer review of Dr. Sherr in August 2015. On August 7, Dr. Wallenfriedman sent Dr. Sherr an email notifying him that the Spine Council had selected one case for peer review—a case initially identified in one of Dr. Wallenfriedman's emails to Dr. Fink. On September 21, Dr. Wallenfriedman sent another email, informing Dr. Sherr of a second case being sent to peer review. This case had been identified by a safety event report, as well as from a referral by HealthEast's Peer Review and Medical Director, Dr. Peter Tanghe, and from Dr. Wallenfriedman's emails to Dr. Fink. Both of Dr. Wallenfriedman's emails advised Dr. Sherr that the cases would be discussed at a peer review meeting on October 6, notified him that his attendance was required at

that meeting, and requested that he send documents related to the cases to the peer reviewers.

Meanwhile, on September 1, between the first and second emails Dr. Wallenfriedman sent to Dr. Sherr, the Spine Council held its regular monthly meeting. Drs. Dunn and Gregory, who were not members of the Spine Council, also attended, as did two additional guests. Dr. Sherr (also not a member of the Spine Council) did not attend. Dr. Wallenfriedman presented a summary of the data from the Spine Quality Report covering January to June 2015. The data showed that one of fourteen surgeons tracked over this period, whose identities were anonymized, had six surgical site infections, while no other surgeon had more than two. The Spine Council requested further review for this particular surgeon. The surgeon was later identified as Dr. Sherr.

At some point around this time, and prior to the October 6 peer review meeting, Dr. Wallenfriedman shared data from the Spine Quality Report with Kathryn Correia, the Chief Executive Officer of HealthEast. Afterward, Correia asked Dr. Kolar, the Senior Vice President and Chief Medical Officer of HealthEast, to be involved in the peer review process for Dr. Sherr.

On October 2, the Spine Council held a conference call to discuss Dr. Sherr's upcoming peer review meeting. The participants on the call were Nurse Fletcher and Drs. Wallenfriedman, Tanghe, Kvasnicka, Kolar, and Fink. Dr. Wallenfriedman brought up the six cases from the Spine Quality Report (four of which Dr. Wallenfriedman had also identified in her previous emails to Dr. Fink) and asked the other participants for their thoughts on whether they met the criteria for peer review. Dr. Wallenfriedman advocated for adding the six cases to the October 6 peer review meeting. While most of the other participants agreed that the six cases should be addressed soon, some wondered whether October 6 was too early. After further discussion, the group decided to assign the six cases to reviewers and discuss them at the October 6 meeting.

Later in the day on October 2, Dr. Tanghe sent Dr. Sherr an email notifying him of the six additional cases to be discussed at the October 6 meeting. Guided by the Peer Review Policy, the Spine Council distributed the cases to different practitioner reviewers, and the completed Peer Review Forms were consolidated into case abstracts prior to the October 6 meeting. Dr. Sherr submitted his own written responses addressing all eight cases—the initial two and the additional six—on October 5.

On October 6, the Spine Council held its peer review meeting for Dr. Sherr. Dr. Sherr attended, as did two of his MSBI colleagues on the Spine Council, Drs. Stefano Sinicropi and Glenn Buttermann. Drs. Dunn and Gregory were also present. At the meeting, Dr. Wallenfriedman gave a PowerPoint presentation summarizing the data from the Spine Quality Report and identifying other areas of concern with Dr. Sherr's surgeries. Dr. Sinicropi responded, explaining that Dr. Sherr's infection rate should be considered in relation to the high-risk population Dr. Sherr treated. Dr. Sinicropi added that he was willing to work with Dr. Sherr to develop a plan to reduce the risk of infections for his patients in the future. The Spine Council agreed to a set of proposed solutions, including mentoring and monitoring Dr. Sherr, and scheduled a follow-up meeting for October 20.

On October 12, Dr. Tanghe asked Nurse Fletcher to send an invitation to the October 20 meeting to all attendees of the October 6 meeting except Dr. Sherr. Nurse Fletcher sent the email, but used a different—and incorrect—email address for Dr. Sinicropi than the one used for the October 6 meeting. As a result, Dr. Sinicropi did not receive the invitation (though the meeting minutes list him as "invited") and did not attend the meeting. Because Dr. Buttermann, who did receive the invitation, was unable to attend, no one from MSBI was present during the October 20 meeting.

On October 20, the Spine Council held their follow-up meeting on Dr. Sherr's cases. A number of Spine Council members were in attendance, as were Drs. Kolar, Dunn, and Gregory. The members discussed the peer review cases and voted by

secret ballot on whether to suspend Dr. Sherr's privileges at HealthEast. All of the Spine Council members present, in addition to one absent member who voted by email, decided to do so.

Immediately after the meeting, Dr. Kolar imposed a summary suspension of Dr. Sherr's privileges and notified Dr. Sherr of his suspension. When Dr. Sinicropi learned of the meeting and the suspension, he emailed HealthEast, saying "[MSBI] was never notified of the meeting this morning. This is unacceptable and needs to be remedied immediately." Meanwhile, within the local neurosurgery community, word of Dr. Sherr's suspension spread quickly.

On October 22, the MEC met to discuss Dr. Sherr's summary suspension, in accordance with HealthEast's bylaws. Dr. Sherr was invited to this meeting but was asked to remain outside of the room for the beginning. Dr. Kolar explained to the MEC the reasons behind his decision to impose summary suspension, citing Dr. Sherr's "significant outlier status with respect to surgical site infection rate," "excessive blood loss during surgery," and questionable patient selection process. Dr. Kolar told the MEC that MSBI had proposed a mentoring program to remedy the issues, but that the Spine Council concluded that such a program would have been insufficient. Dr. Tanghe then discussed the Spine Quality Report and the information about Dr. Sherr's infection rates that it reflected. Finally, Dr. Wallenfriedman offered a PowerPoint presentation with information on Dr. Sherr's peer review cases and a summary of the October 20 meeting. The PowerPoint indicated that MSBI members were invited to participate in the October 20 meeting but were not present. The MEC meeting minutes state that Dr. Sinicropi's absence was due to a "miscommunication with his email." After Dr. Wallenfriedman's presentation, Dr. Sherr was invited to join the meeting. He explained that his higher infection rate was due to the fact that his cases and patients were more complex than those of other surgeons at HealthEast. He also objected to Dr. Wallenfriedman's involvement in the peer review process, considering her status as his direct competitor.

At the close of all of the presentations, the MEC deliberated and voted twelve to one in favor of upholding Dr. Sherr's suspension. Dr. Kolar notified Dr. Sherr of the decision and filed a public report of the suspension with the National Practitioner Databank.

On November 19, Dr. Sherr requested a hearing on his suspension before HealthEast's Judicial Review Committee (JRC). The JRC held its hearing on February 1, 2016. Finding that Dr. Sherr had proven that "the evidence as relied on cannot justify imposition of summary suspension as endorsed by the MEC," the JRC elected to overturn Dr. Sherr's suspension on February 4. It added, however, that its decision was "not an endorsement of the medical care Dr. Sherr provided or his surgical competence."

In December 2015, while Dr. Sherr's summary suspension was still in effect, Dr. Sherr and MSBI renewed his employment contract for another year. But Dr. Sherr ultimately determined that his "referral sources had been devastated, and his ability to continue to be a top revenue producer for MSBI had been destroyed." He therefore resigned from MSBI in March 2016 and relocated his practice to Florida.

II.

Dr. Sherr claims that HealthEast and the Neuro Group made a number of defamatory comments about him over the course of his relationship with HealthEast. At the district court, Dr. Sherr identified 18 statements in particular that he argues constitute defamation. He also argues that the Appellees tortiously interfered with his prospective economic advantage and tortiously interfered with his contracts under Minnesota law.

After reviewing Dr. Sherr's arguments, the district court granted summary judgment for the Appellees. First, it concluded that both federal and state peer review immunity cover the review process Dr. Sherr experienced at HealthEast. As such, it found that the Appellees were not liable for defamation or tortious

interference for anything that occurred during Dr. Sherr's peer review.[2] As to the statements made outside of peer review, the district court found that they did not constitute actionable defamation for several reasons. The court rejected some of the allegedly defamatory statements because Dr. Sherr did not allege them in his amended complaint. Others, the district court concluded, relied on inadmissible hearsay. Finally, the district court found that, even if they had been alleged in the complaint, some of the statements were not actionable because they were opinions, rather than assertions of fact. Dr. Sherr appeals the district court's decision.

III.

We review the district court's grant of summary judgment de novo. Togerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). When deciding a motion for summary judgment, a court is required to view disputed facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in its favor. Scott v. Harris, 550 U.S. 372, 378 (2007). A court at this stage "does not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." Morris v. City of Chillicothe, 512 F.3d 1013, 1018 (8th Cir. 2008). Rather, the focus is on whether there are genuine issues of material fact for trial. Id. Substantive law in the relevant area dictates which facts are material, as "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A.

Appellees contend that most of the 18 potentially defamatory statements at issue are not identified in Dr. Sherr's amended complaint and therefore cannot provide a factual basis for his defamation claim against them. Dr. Sherr responds

---

[2]The district court also found that Dr. Sherr had not established a genuine dispute of material fact on the merits of his tortious interference claims and granted summary judgment on that basis as well.

that Appellees' argument relies on a "tortured and overly restrictive view of applicable precedent" and advocates that we consider all of the identified statements, even though he did not include them in his amended complaint.

Under Minnesota law, defamation claims must be pleaded with "a certain degree of specificity." Thompson v. Campbell, 845 F. Supp. 665, 679 (D. Minn. 1994); see also Stead-Bowers v. Langley, 636 N.W.2d 334, 342 (Minn. Ct. App. 2001) (noting that plaintiffs must "specifically plead the alleged defamatory statements"). This requirement exists to ensure that complaints "provide sufficient specificity in order to evaluate whether a privilege applies, as well as to put defendants on notice of the scope of the defamation claim." Walker v. Wanner Eng'g, Inc., 867 F. Supp. 2d 1050, 1056 (D. Minn. 2012) (cleaned up). While plaintiffs may not have to directly quote the allegedly defamatory words, see Thompson, 845 F. Supp. at 679 (noting that plaintiff's failure "to recite the exact language spoken is not fatal to her defamation claim"); but see Moreno v. Crookston Times Printing Co., 610 N.W.2d 321, 326 (Minn. 2000) ("Minnesota law has generally required that in defamation suits, the defamatory matter be set out verbatim."), their complaints generally must identify "who made the allegedly [defamatory] statements, to whom they were made, and where." Pinto v. Internationale Set Inc., 650 F. Supp. 306, 309 (D. Minn. 1986). Any statements not so identified in the complaint are beyond the scope of a plaintiff's defamation claim. See Thompson, 845 F. Supp. at 680 ("The scope of [plaintiff's] defamation claim is limited to the allegations of the complaint."); see also Benson v. Nw. Airlines, Inc., 561 N.W.2d 530, 538 (Minn. Ct. App. 1997).

Dr. Sherr cites Walker v. Wanner Engineering to argue that statements he identified through discovery but did not incorporate into his complaint may be considered part of his defamation claim. In Walker, the plaintiff's complaint identified the specific statements at issue and the parties who said them, but did not specify where the statements were made. The court explained that "[a]lthough the 'where' is not expressly stated for either defamation claim, the context of both allegations put [defendant] on notice that the defamatory statements were both made

within [defendant's] facility." Walker, 867 F. Supp. 2d at 1056-57. Walker is thus better understood as establishing that, in some circumstances, a defamation complaint need not specify the precise location of the defamatory comments, so long as the defendant has sufficient notice of the general locale to be able to identify the statement. We do not read it as upending the general requirements that defamation must be pleaded with specificity and that defamation claims are limited to what is identified in the complaint.

Here, though Dr. Sherr's amended complaint states that members of the Neuro Group "have made many . . . false and defamatory statements about Plaintiff," it specifically describes only three statements. Namely, the complaint alleges (1) that the Neuro Group "would disparage Dr. Sherr [to operating room nurses] for how quickly he would complete his surgeries," claiming that "Dr. Sherr's speed in surgery was putting his patients at risk"; (2) that, at the October 6 peer review meeting, the Neuro Group accused Dr. Sherr of "fail[ing] to order some basic and necessary imaging in connection with the treatment" of eight patients; and (3) that Dr. Dunn professed at that same meeting "that Dr. Sherr was known by the operating room staff to have his patients 'lose a liter of blood for every level of fusion surgery Dr. Sherr performed.'" Dr. Sherr could have amended his complaint to incorporate the additional allegedly defamatory statements identified during discovery, but he did not do so.[3] And given the requirement that defamation claims be pleaded with specificity, only the statements included in the amended complaint can form the basis of Dr. Sherr's claim. Therefore, these are the only three statements before us on appeal.[4]

_____

[3]On April 16, 2019, the same day that Dr. Sherr filed his response to Appellees' motion for summary judgment, he also moved to amend his complaint once again. The magistrate judge denied his motion, reasoning that Dr. Sherr did not act diligently in seeking leave to amend and that his motion came after the February 1, 2019 deadline for filing non-dispositive motions.

[4]In the list of 18 statements that Dr. Sherr provided, statements seven and nine are both statements by members of the Neuro Group to operating room physicians about the speed of Dr. Sherr's surgeries. Both are properly within the amended

-12-

B.

As to the first remaining statement—the Neuro Group's alleged comments about the speed of Dr. Sherr's surgeries—the district court properly found that this allegation relied exclusively on inadmissible hearsay and thus cannot provide a factual basis for a defamation claim. See Firemen's Fund Ins. Co. v. Thien, 8 F.3d 1307, 1310 (8th Cir. 1993) ("Inadmissible hearsay evidence alone may not defeat a summary judgment motion."). Dr. Sherr's opening brief does not address this aspect of the district court's decision. Because "[c]laims not raised in an opening brief are deemed waived," Jenkins v. Winter, 540 F.3d 742, 751 (8th Cir. 2008), we will not review the district court's rejection of this first statement.

C.

We are thus left with two allegedly defamatory statements, both made by members of the Neuro Group at the October 6 peer review meeting. Appellees argue that they are immune from liability for these statements under both federal and state peer review immunity statutes, while Dr. Sherr claims that neither statute applies.

Minnesota's peer review immunity statute provides:

> [N]o . . . person who is a member . . . of . . . a review organization shall be liable for damages or other relief in any action brought by a person or persons whose activities have been or are being scrutinized or reviewed by a review organization, by reason of the performance by the person of any duty, function, or activity of such review organization . . . .

Minn. Stat. § 145.63, subdiv. 1. "The clear import of this statute is to encourage the medical profession to police its own activities with a minimum of judicial

---

complaint's claim that "[t]he HealthEast Neuro Group said that Dr. Sherr's speed in surgery was putting his patients at risk," but we will refer to them as a single "statement" for ease of reference.

-13-

interference." Campbell v. St. Mary's Hosp., 252 N.W.2d 581, 587 (Minn. 1977). "Whether a party is entitled to statutory immunity is a question of law." In re Peer Review Action, 749 N.W.2d 822, 827 (Minn. Ct. App. 2008).

In keeping with the purpose of Minnesota's peer review statute, a peer reviewer loses immunity only if that reviewer was motivated by malice toward the subject of the review. Minn. Stat. § 145.63, subdiv. 1. In "the context of statutory immunity," malice means "nothing more than the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right." In re Peer Review, 749 N.W.2d at 827 (cleaned up). The question of whether a peer review inquiry was motivated by malice is an objective one, focused not on what the reviewers personally believed, but rather on how the process was conducted. See id. at 828 (affirming finding of malice where the defendant "intentionally, and repeatedly, violated its own established procedural safeguards"); see also Campbell, 252 N.W.2d at 587 (rejecting claims of malice premised on "unsubstantiated speculation as to the reasons for the revocation of [a doctor's] surgical privileges"). Accordingly, in Minnesota, "[j]udicial review of peer-review actions is properly limited . . . to only whether peer reviewers abided by their own established procedures." In re Peer Review, 749 N.W.2d at 829. We will infer malice only if the peer reviewers did not follow those procedures.

At the time of the investigation into Dr. Sherr's surgeries, HealthEast's peer review process was dictated by its Practitioner Peer Review Policy. The Policy laid out specific procedures and guidelines for HealthEast employees to follow while conducting peer review, "to ensure a fair and objective evaluation of individual practitioner performance and reasonable actions based on assessment findings." Dr. Sherr points to a number of features of his peer review process that he claims deviated from the Policy and support a finding of malice.

First, Dr. Sherr argues that Dr. Wallenfriedman was the "catalyst" behind the decision to initiate peer review inquiries into all eight of the cases the reviewers ultimately considered. However, this contention is unsupported by the record, which

-14-

demonstrates that concerns about Dr. Sherr's surgeries came from a number of different sources, including the Spine Quality Report and Nurse Lund. In any event, the Policy makes clear that "[c]ases potentially needing peer review" could be received from "[r]eferrals from internal sources, such as physicians." Even if Dr. Wallenfriedman had been the sole catalyst, Dr. Sherr fails to explain how this would have violated applicable procedures.[5] Dr. Sherr also takes issue with Dr. Wallenfriedman's involvement in the peer review process at all, given her status as his competitor for patient referrals. However, as Chair of the Spine Council, the body tasked with conducting the peer review, Dr. Wallenfriedman was permitted but not required to "limit medical staff attendance for particular case discussions" where "[c]linical peers may have discriminatory or anti-competitive motives in evaluating the individual being reviewed." Dr. Wallenfriedman could have abstained due to a potential conflict as a competitor of Dr. Sherr's, but the policy is permissive, not mandatory. Her choice to participate was thus in compliance with the Policy's discretionary approach.

Next, Dr. Sherr claims that Dr. Wallenfriedman "notified [Correia] of Sherr's infection rate issues before the peer review process was completed," in violation of the Policy's requirement that all peer review procedures "be held in the strictest

---

[5]Dr. Sherr makes the related claim that HealthEast should have addressed his cases through the organization's Focused Professional Practice Evaluation Policy and Procedure (FPPE), which provides for evaluation of all physicians six months after they have been granted a new privilege, rather than through formal peer review. Dr. Sherr argues that HealthEast's failure to complete the FPPE process provides evidence of objective malice. Even assuming that the procedures we consider in our malice inquiry should include ones separate from the peer review process at issue here, which we are not convinced of, we do not see the procedural irregularity that Dr. Sherr does. The FPPE policy indicates that an "FPPE will be initiated 6 months after [a new] privilege was granted" and that "the Clinical Council Chair will be notified if at any time during a review period, there are concerns regarding a practitioner's competency to perform specific clinical privilege(s)." Once notified, the Chair may refer the practitioner's cases to peer review, where HealthEast's normal peer review processes apply. Here, Dr. Sherr's cases were elevated to formal peer review before the FPPE process would even have begun.

-15-

confidence." Even assuming that Correia, the Chief Executive Officer of HealthEast, was not properly part of the confidential peer review process, the record indicates that Dr. Wallenfriedman showed Correia the Spine Quality Report, not any information from the peer review process itself. The Spine Council generated the Spine Quality Report in the ordinary course of its work as a clinical council, separate and distinct from its review of Dr. Sherr. Additionally, the Policy makes clear that Dr. Wallenfriedman had the discretion to include "any other individuals" in the peer review meetings. Dr. Sherr also argues that Dr. Wallenfriedman violated applicable notice policies by adding six additional cases to the October 6 meeting only four days before that meeting and by not informing Dr. Sinicropi of the October 20 follow-up meeting. However, the Policy contains no such notice requirements, and Dr. Sherr points to no rules that would have required notice in this situation. Finally, Dr. Sherr points to a number of "willfully false statements" that he claims Dr. Wallenfriedman made about him over the course of the peer review process. But assessing this claim necessarily requires an inquiry into Dr. Wallenfriedman's mental state: both what she knew at the time and what her intentions were in making the statements. This is exactly the sort of subjective analysis foreclosed by Minnesota's peer review immunity standards, and we will not consider it as evidence of malice.

We are sympathetic to Dr. Sherr, who may genuinely have perceived the peer review process at HealthEast to be unfair or biased against him. However, under Minnesota law, our focus is not on the perception of the person under peer review or on the individual motivations of the reviewers. Rather, we are "limited . . . to only whether peer reviewers abided by their own established procedures." In re Peer Review, 749 N.W.2d at 829. Because the record offers no indication that the reviewers did not so abide, the Appellees are entitled to peer review immunity on the remaining two statements, and the district court properly dismissed Dr. Sherr's defamation claim.

-16-

IV.

Dr. Sherr's amended complaint also includes claims for tortious interference with prospective economic advantage and tortious interference with contract. To the extent these alleged interferences occurred solely through the peer review process itself, Appellees are entitled to peer review immunity. But in the event peer review immunity does not fully shield Appellees, we will address each claim.

A.

Under Minnesota law, a plaintiff must prove five elements to establish tortious interference with prospective economic advantage:

1) The existence of a reasonable expectation of economic advantage;

2) Defendant's knowledge of that expectation of economic advantage;

3) That defendant intentionally interfered with plaintiff's reasonable expectation of economic advantage, and the intentional interference is either independently tortious or in violation of a state or federal statute or regulation;

4) That in the absence of the wrongful act of defendant, it is reasonably probable that plaintiff would have realized his economic advantage or benefit; and

5) That plaintiff sustained damages.

Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc., 844 N.W.2d 210, 219 (Minn. 2014).

Dr. Sherr identifies two sources of prospective economic advantage that he claims Appellees interfered with: a referral relationship with Allina Health, another regional healthcare provider, and his ability to successfully continue on the track to become a partner at MSBI. As to the Allina relationship, the only evidence Dr. Sherr provides that Appellees intentionally interfered is a claim that they told Allina about

his suspension and referred to him as a "dangerous surgeon." As the district court correctly pointed out, this claim relies on inadmissible hearsay. Because Dr. Sherr did not provide admissible evidence in support, Appellees were entitled to summary judgment on this claim. See Firemen's Fund Ins. Co., 8 F.3d at 1310.

Regarding his relationship with MSBI, Dr. Sherr cannot meet all of the elements required for a tortious interference claim. Specifically, he would have to demonstrate that Appellees' alleged interference with his expectation of economic advantage was either independently tortious or in violation of a state or federal statute. Gieseke, 844 N.W.2d at 219. As we understand it, Dr. Sherr's argument is that his relationship with MSBI was ruined because the news of his HealthEast suspension traveled around the medical community. But HealthEast's decision to suspend Dr. Sherr was not itself tortious, and the Appellees were not legally responsible for the secondary effects of his suspension. Without offering some evidence that the Appellees independently acted tortiously or illegally as required by Minnesota law, Dr. Sherr cannot show the district court erred in granting Appellees' motion for summary judgment.

B.

Dr. Sherr also alleges that Appellees interfered with two of his contractual relationships: his clinical privileges with HealthEast and his employment contract with MSBI.

To prevail on a claim of tortious interference with contract, Dr. Sherr must establish five elements: "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages." Sysdyne Corp. v. Rousslang, 860 N.W.2d 347, 351 (Minn. 2015) (cleaned up). Additionally, he must "provide evidence that [defendants'] acts legally caused [him] to lose any contractual rights." Lee v. Metro. Airport Comm'n, 428 N.W.2d 815, 822 (Minn. Ct. App. 1988).

-18-

Against this legal standard, there is no genuine issue of material fact as to Dr. Sherr's claim. First, Dr. Sherr has provided no evidence that he had a contract with HealthEast at all or that his privileges should be interpreted as a contract. Second, Dr. Sherr has not established that Appellees caused a breach of the MSBI contract in place at the time of his suspension or any loss of his related contractual rights. Indeed, after his initial contract expired—and months after the suspension—Dr. Sherr and MSBI renewed their contractual relationship. Appellees are entitled to summary judgment on this claim, as well.

V.

Considering the applicable substantive law, Dr. Sherr has not demonstrated that the record reflects any genuine issue of material fact that might change the outcome of his suit. The district court properly concluded that Appellees were entitled to summary judgment on all of Dr. Sherr's claims, and we affirm its judgment.

SHEPHERD, Circuit Judge, concurring in part and dissenting in part.

I dissent from Parts III.C and IV.A of the Court's opinion because I believe genuine issues of material fact preclude granting summary judgment on Dr. Sherr's defamation and tortious interference with a prospective economic advantage claims arising out of the peer review process. I concur in the Court's opinion with respect to Dr. Sherr's other claims.

I agree with the Court that Dr. Sherr pled the Appellees' statements made in the course of the Neuro Group's October 6 peer review meeting with sufficient specificity. See Walker v. Wanner Eng'g, Inc., 867 F. Supp. 2d 1050, 1056 (D. Minn. 2012). However, I would find that there are genuine issues of material fact concerning whether those statements are entitled to state or federal immunity. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Peer review actions do not enjoy state statutory immunity if they are motivated by malice, which may be

-19-

inferred when peer reviewers willfully violate their own established procedures. See In re Peer Review Action, 749 N.W.2d 822, 828-29 (Minn. Ct. App. 2008).[6] HealthEast's Policy required "a fair and objective evaluation" of Dr. Sherr's performance. While the peer review organization chair had discretionary authority to limit review attendance based on "discriminatory or anti-competitive motives," the individual empowered with that discretion, Dr. Wallenfriedman, was one of the individuals allegedly harboring anti-competitive motives. It is axiomatic that a neutral decisionmaker is a quintessential pillar of a fair and objective process. See Bracy v. Gramley, 520 U.S. 899, 904-05 (1997) (discussing the presence of a neutral arbiter as a constitutional floor of due process). Therefore, I would find that whether this high-level conflict of interest deprived Dr. Sherr of the "fair and objective evaluation" the Policy required, which in turn would infer malice, is a genuine issue of material fact.

Further, federal immunity requires "adequate notice and hearing procedures," 42 U.S.C. § 11112(a)(3), which includes a process conducted by "a hearing officer . . . who is not in direct competition with the physician involved," id. § 11112(b)(3). Because of Dr. Wallenfriedman's position as the peer review organization chair, I would find that whether the review process included "adequate notice and hearing procedures" is a genuine issue of material fact.

---

[6]The Court contends that a jury determination on this issue is improper because "[w]hether a party is entitled to statutory immunity is a question of law." Id. at 827. However, "[t]he conclusion of malice," a necessary showing to defeat statutory immunity, "depends on found facts." Id.; cf. Brooks v. Doherty, Rumble & Butler, 481 N.W.2d 120, 126 (Minn. Ct. App. 1992) (explaining that whether an employer abused its qualified privilege by acting with actual malice is "a question for the jury"). Notably, in In re Peer Review, the appellant "d[id] not challenge the district court's factual findings," but instead argued that the facts, as a matter of law, did not give rise to malice. Id. Here, Dr. Sherr *does* challenge the facts, that is, whether the Neuro Group violated its own procedures by failing to conduct "a fair and objective evaluation." In doing so, Dr. Sherr has presented sufficient evidence for a reasonable jury to infer that the Neuro Group acted with malice; therefore, whether the Neuro Group is entitled to statutory immunity must be reserved for the jury's determination.

Assuming that Dr. Wallenfriedman's involvement does bar statutory immunity, I would find that these "objectively verifiable facts" are actionable defamatory statements, the truthfulness thereof being a question for the jury. Thomas v. United Steelworkers Loc. 1938, 743 F.3d 1134, 1142 (8th Cir. 2014) (citation omitted); see McKee v. Laurion, 825 N.W.2d 725, 730 (Minn. 2013). I would also find that because this arguably biased review process rendered Dr. Sherr's future partnership with MBSI impracticable, there exist genuine issues of material fact regarding Dr. Sherr's claim for tortious interference with a prospective economic advantage. See Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc., 844 N.W.2d 210, 219 (Minn. 2014). Thus, I would find that Dr. Sherr has demonstrated genuine disputes throughout his claim that should be resolved by the jury and that make summary judgment inappropriate.

———————————————————